[No. G008788. Fourth Dist., Div. Three. June 15, 1990.]

In re BABY BOY M., a Minor.
ANDREAS W. et al., Petitioners and Respondents, v.
STEPHANIE M. et al., Objectors and Appellants.

**COUNSEL**

John L. Dodd, Paoli & Paoli and Sylvia L. Paoli under appointments by the Court of Appeal, for Objectors and Appellants.

Van Deusen, Youmans and Walmsley and Christian R. Van Deusen for Petitioners and Respondents.

Christopher J. Miller, under appointment by the Court of Appeal, for Minor.

OPINION

**CROSBY, J.**—Concluding a teenage mother who placed her infant with prospective adoptive parents had abandoned the child, the superior court terminated her parental rights. The court determined the natural father was not a presumed father (Civ. Code, § 7017) and his consent to the adoption was unnecessary. The court rejected the natural parents' petition for return of the child pursuant to Civil Code section 226b. We reverse with directions to restore custody to the birth mother.

I

Stephanie M. was a 15-year-old unwed high school student when she became pregnant. Her 19-year-old boyfriend, Steven A., stopped dating her when she told him of the pregnancy. Stephanie's mother and stepfather did not learn of her condition until she was in her seventh month. They were not eager for their daughter to bring a baby into their home; and arrangements were soon made through a physician for an independent, open adoption by the W.'s.[1]

Baby Boy M. was born on January 5, 1989. Stephanie signed the department of social services' "Health Facility Minor Release Report" (designated as form AD 22) on January 8. Under the boldface heading, "IMPORTANT NOTICE ," the form states it "is not a relinquishment or consent for adoption." The notice adds that "there are two basic ways a child may be placed for adoption." If the child is relinquished to a licensed adoption agency, "the relinquishment may not be rescinded except by mutual agreement." If, on the other hand, "[t]he parent [ ] place[s] the child directly with adoptive parents . . . the [birth] parent retains all responsibility for the child's custody and control until the court issues the adoption decree. *The parent has the right to reclaim the child at any time prior to signing the consent to the adoption.* Once the consent to the adoption by the [adoptive parents] is signed by the birth parents(s) in the presence of a representative of the Department of Social Services or a licensed public adoption agency it may be withdrawn only with court approval." (Italics added; see Civ. Code, §§ 224m, 226b, 226.11.) Stephanie acknowledged she was "releasing [her] child from the hospital for the purpose of [ ] Adoption Planning." The form also provided the birth mother "retain[ed] all parental rights to [the child's] custody" and authorized the prospective adoptive parents "to make provisions for medical and surgical care for [the] child . . . for a period not

---

[1] The prospective adoptive mother is a former employee of the physician. The physician's wife is the attorney who initially purported to represent both the prospective adoptive parents and the birth mother. When the birth mother indicated a desire to reclaim her child, the attorney withdrew entirely from the matter.

to exceed six months from the date of [the] child's release from [the] hospital."

The prospective adoptive parents signed this form on January 8. Above their signatures the form provided, "I/we understand that this authorizes only the release of this child from the hospital. This is not a consent or relinquishment of this child for adoption." Baby Boy M. was released from the hospital to their care. Before he left the hospital, Stephanie's mother reported to Mrs. W. that a hospital social worker who spoke with Stephanie formed the opinion that she would not be emotionally able to go through with the adoption.

A month before the baby's birth, on December 12, 1988, the prospective adoptive parents signed a "Statement of Intent" form pledging to "maintain[ ] an ongoing relationship with Stephanie [ ] and her family." Stephanie signed the form January 9, 1989. It is a single-page, typed document, which we presume was prepared by the attorney then representing all parties to the adoption. On January 11, 1989, the attorney filed a petition for adoption on behalf of the W.'s and notified the Orange County Department of Social Services an independent adoption was pending.

Within six months Stephanie and Steven decided to marry and raise their child. Steven admitted an alcohol and drug abuse problem and was enrolled in Alcoholics Anonymous. Together the young couple was participating in premarital counseling, and both were also involved in individual counseling. The parents' families consented to their decision to marry and reclaim the baby.

Stephanie and Steven met with a caseworker from the department of social services on two occasions to discuss the return of the child. At the first meeting, they told the caseworker they wanted the baby returned. She told them to think about their decision for one week. When they met again, the young parents signed a "Refusal to Give Consent to Adoption" (otherwise referred to as the AD 20 form). They also wrote a letter to the Clerk of the Orange County Superior Court to advise they would not consent to the adoption.

Stephanie and her family met with the prospective adoptive parents in June 1989. The meeting was acrimonious. Mrs. W. responded to the birth parents' demands for return of the child with a list of conditions under which they would "consider" complying with the parents' decision.

Unfortunately, when it became clear days later that the birth parents wanted the child but the prospective adoptive parents would not surrender

him, battlelines were drawn. The W.'s retained their present attorney who filed one petition to determine the parental rights of the alleged natural father and the necessity of obtaining his consent to the adoption per Civil Code section 7017 and another to terminate the birth parents' rights under Civil Code section 232, subdivision (a)(1), claiming they had abandoned the child. The W.'s also sought to be appointed the guardians of Baby Boy M. while court proceedings were pending.

The natural parents retained counsel who responded with a petition denominated as one to "RECLAIM CHILD," which the court eventually retitled as a petition for writ of habeas corpus. The superior court consolidated the matters. The department of social services prepared several reports and evaluations. The author of a preliminary report, dated the day the court issued its tentative judgment, concluded, "it does not appear that the minor needs the protection of a guardian. The birth parents are available, willing and appear able to meet the needs of the minor." A deputy probation officer also prepared a report required under Civil Code section 232. That document did little more than reiterate statements made by the various parties concerning the proposed adoption and the parents' refusal to consent and concluded, "It is respectfully recommended that the Court make an order in the best interests of the minor based on the evidence presented in court and the statements contained in this report."

On August 16, 1989, the court rendered judgment in favor of the prospective adoptive parents. The judge determined Steven A. was not a presumed father and found by clear and convincing evidence that it would be detrimental to the child to require the natural father's consent to the adoption. By the same standard he terminated Stephanie M.'s parental rights, finding she "failed to communicate with and failed to provide support for the child for a period of over six months with the intent to abandon." The court also appointed the W.'s as guardians of the baby and found adoption by them "is in the best interest of the child."

The natural parents have appealed. The attorney appointed for the infant has urged that the judgment be affirmed.

## II

■ The law of adoptions is purely statutory. (*Adoption of McDonald* (1954) 43 Cal.2d 447, 452 [274 P.2d 860]; see Civ. Code, § 221 et seq.) ■ An adoption is accomplished either through an agency or by independent means. And there are several fundamental differences between the two: "In an independent adoption the legal custody of the child remains in the natural parent *unless and until* the adoption is granted, as contrasted to an

agency adoption where legal custody has been relinquished to the agency." (*Adoption of Driscoll* (1969) 269 Cal.App.2d 735, 738 [75 Cal.Rptr. 382], italics added.) Moreover, in an agency adoption, unless the prospective adoptive parents were the child's foster parents, the child is typically not placed in their home until the natural parents' rights have been terminated. In an independent adoption, however, not only have parental rights not been terminated at the time of placement, but in many cases, the birth mother has not yet given her written consent to the adoption.

The distinction between agency and independent adoptions is also reflected in the AD 22 form signed by Stephanie while in the hospital. With a minimum of legalese, that form advised her of two important facts: (1) The surrender of her child to the prospective adoptive parents was not to be considered a relinquishment of her parental rights, and (2) there would be no adoption until she gave her written consent. Civil Code section 226b mandates the return of a child to the natural parent who refuses to consent to the adoption.

■ The right of a natural parent who refuses to consent to the adoption to reclaim a child under Civil Code section 226b is not open-ended, however. Parental rights may be terminated if a child is left "in the care and custody of another for a period of six months" and the parent had the intent to abandon. (Civ. Code, § 232, subd. (a)(1).) And once a parent's rights have been terminated, his or her consent is no longer necessary before an adoption may be finalized. (Civ. Code, § 224, subd. 1.)

Reconciling Civil Code section 232 with the adoption statutes, the rule has become that a natural parent has six months within which to refuse to consent to the adoption and reclaim a child. But the parental rights of a birth mother who signs the refusal to consent within six months may not be terminated on the basis of abandonment simply because she initially contemplated adoption and placed her child with the prospective adoptive parents. (*Guardianship of Rutherford* (1961) 188 Cal.App.2d 202 [232 Cal.Rptr. 741].)

Although the *Rutherford* opinion is more than a generation old, its legal principles have retained their vitality. There, as in this case, an unwed mother arranged an independent adoption and the prospective adoptive parents took the baby home from the hospital. The natural mother refused to sign the consent to adopt, however, and sought to regain physical custody of her child. The prospective adoptive parents responded with a petition for guardianship of the baby, alleging the natural mother had abandoned her child. The trial court agreed and entered judgment in their favor.

The Court of Appeal reversed: "[A]ll of the acts and declarations of [the birth mother] upon which [the prospective adoptive parents] rely to sustain the finding of abandonment, were done and said with respect to a prospective adoption and under the influence of the protective policy of the statute which assured her that no adoption would become final until she had given her consent thereto in writing. The evidence in no manner supports the conclusion that [the birth mother] by any such acts or declarations ever intended to ' "entirely sever, so far as it is possible to do so, the parental relation" ' [citation], or give up her right to custody 'absolutely with no intention of reclaiming it' [citation]." (188 Cal.App.2d at p. 209.)

In making that determination, the court explained what conduct, in the context of a prospective adoption, would *not* support a finding of abandonment: "It should be noted . . . an offer to permit the adoption of a child [citations]; making arrangements for placement [citation]; mere acquiescence in support by others [citations]; or failure to pay for maintenance when no demand therefor has been made [citations], or no ability to provide is shown [citations], by itself, does not prove an intent to abandon. Moreover, acts of a temporary nature are not sufficient upon which to base a finding of a permanent abandonment. [Citations.] [¶] We do not mean to imply that a mother may not abandon her child during the course of a proposed adoption; that her conduct may not be such as would constitute an abandonment merely because such a proceeding is pending. The contrary has been adjudicated. [Citations.] However, when the acts and declarations of the mother which are relied upon to establish an abandonment, in truth, are made in contemplation of a proposed adoption to which the mother, in the exercise of her legal right, eventually refuses to consent, no desertion or intention to abandon is proven. To hold otherwise would frustrate the underlying policy of the adoption statute which decrees that the relationship between the natural mother and her child should not be terminated through an adoption proceeding unless and until the mother has indicated her consent thereto in writing." (188 Cal.App.2d at p. 208; see also *Guardianship of Baby Boy M.* (1977) 66 Cal.App.3d 254, 277 [135 Cal.Rptr. 866] ["an execution of consent to adoption does not constitute an unequivocal act of abandonment"].)[2] The trial court had determined the birth mother was "a fit and proper person to have custody of her child," and the appellate court reversed the judgment with directions to enter

---

[2] The W.'s cite *In re Brittany H.* (1988) 198 Cal.App.3d 533 [243 Cal.Rptr. 763]. But it failed to discuss *Rutherford* and is distinguishable in any event. The facts there, while similar to those in *Rutherford* and this case, differed in one critical respect: In *Brittany,* the court made a specific finding that the birth mother merely sought to reclaim her child for placement with another adoptive family. (*Id.,* at p. 550; see also *San Diego County Dept. of Pub. Welfare* v. *Superior Court* (1972) 7 Cal.3d 1, 16-17 [101 Cal.Rptr. 541, 496 P.2d 453] [intent to abandon is supported by birth mother's expressed desire to have child adopted by a different family].)

judgment for the birth mother and "forthwith to deliver" the infant to her. (*Guardianship of Rutherford, supra*, 188 Cal.App.2d at p. 209.)

This court relied on *Rutherford* in the case of *In re Baby Boy B.*■ (Cal.App.). There, too, the trial court terminated a birth mother's parental rights under Civil Code section 232, subdivision (a)(1). Baby Boy B.'s natural mother signed the AD 20 form indicating a refusal to consent to the adoption within several months of the child's birth; but the prospective adoptive parents did not return the child, as they were required to do under the law. Although the department of social services was aware of the mother's refusal to consent to the adoption, it did nothing to assist her in reclaiming the child.

Despite the mother's decision to keep her child, the court terminated her rights because she initially placed the child with the prospective adoptive parents and then did not communicate with the baby during the time he resided with them. By the time of the hearing, as a result of the prospective adoptive parents' refusal to return to the child and the failure of the department of social services to intervene, over six months had elapsed. We determined the criteria for a termination of parental rights based on abandonment did not exist under those circumstances. ▬ We reach the same conclusion here.

Stephanie and Steven acted within six months to reclaim their child. They each signed the AD 20 form on June 22, after several meetings with a caseworker from the department of social services and after months of counseling on their own. They wrote the superior court and advised they would not consent to the pending adoption. Accordingly, Stephanie had every right to expect the unconditional and immediate return of her child, as mandated by Civil Code section 226b. Instead, the W.'s sought to terminate her parental rights, claiming abandonment based on her conduct in permitting them to take physical custody of the baby with the intent to place him for adoption.

Once Stephanie and Steven signed the AD 20 form, no court hearing was necessary to secure their child. A hearing on the W.'s petitions was a separate matter, but the baby should have been returned to the birth mother pending the court's resolution of those matters.

The hearing on the W.'s petition to terminate Stephanie's parental rights should have been short and to the point. As discussed above, parental rights may be terminated under Civil Code section 232, subdivision (a)(1) if a child has been left with others for at least six months with the intent to abandon. Neither prerequisite was met in this case, however.

Here, as in *Baby Boy B.*, the sole reason the child remained away from his birth mother for more than six months was that the prospective adoptive parents refused to honor her change of heart concerning the adoption. Nothing in the law pertaining to independent adoptions or in the documents they and Stephanie signed gave them the right to keep the child once the mother signed the AD 20 form and refused to consent to the adoption: "[The birth mother] expressly did not relinquish her parental rights and she retained the right to custody and control of the child. [The prospective adoptive parents'] temporary physical custody was permissive, but their retention of the child became unlawful when they refused to return the child upon [the mother's] request." (*Rogers* v. *Platt* (1988) 199 Cal.App.3d 1204, 1213 [245 Cal.Rptr. 532].) Stephanie cannot be held responsible for the W.'s unauthorized refusal to return the child within six months.

This fact was essentially recognized by the trial judge, who acknowledged the natural parents sent a letter to the court within six months demanding the return of the child: "It's unquestionable that [Stephanie and Steven] are the natural parents. They did demand the return of the baby on June the 26th, 1989, to the court. That's the letter that was sent." And the court noted, "[I]t's clear that on June the 22nd Stephanie and Steve refused to sign the consents, and that appears to me to be clear evidence of their intention to revoke the expressed intention to adopt." As noted above, this should have been the end of the matter, and the court should not even have reached the second aspect of a termination under section 232, subdivision (a)(1), i.e., intent to abandon. Nevertheless, ignoring the clear statutory mandate, the superior court judge and counsel for the W.'s launched into an eight-day, eleven-witness hearing. The proceeding, which can only be compared to the ordeal of Hester Prynne, proved to be nothing more than a forum for the indictment of an unwed, teenage mother and her family and prospective husband.[3]

---

[3]The trial judge condemned Stephanie as a deceitful ("[n]ot telling our parents about [the pregnancy], not using birth control, no protection against sexually transmitted diseases, . . . not telling the doctors about the secret desire [to keep the child] is deceitful, insensitive, maybe even cruel"), immoral ("[s]ex at 15, particularly with a 19-year-old, is also against our moral ethics of our culture"), and manipulative ("[a]nd then the worst of all, to deceive our parents for a period of seven months and to get a car out of it as a gift for giving up the child [Stephanie received a car for her 16th birthday] just doesn't sound right to me") juvenile who brought her current difficulties on herself and "cannot complain of the result." He dismissed the birth father as "immature" and "relatively weak." The grandparents were labeled as "domineering" and likely to interfere with the birth parents' decisions. The W.'s were described as having "already engaged in a great deal of self-sacrifice. They have adjusted to life with a child. They now have a track record of parenting a child."

On the whole, the tone of the statement of decision is fairly outrageous. Like those who "protest too much," it appears the trial judge could not defend this indefensible judgment except by burying it in a mulch of irrelevant invective toward the birth parents and a paean to the virtue of those seeking to adopt.

The 787-page reporter's transcript concluded with a 43-page oral statement of decision. The court expressly found "that neither . . . Stephanie or Steve or the [W.'s], is unfit under the 300 Welfare and Institutions Code concept. There's no evidence further that Steve or Stephanie are child abusers or would ever be child abusers or were in any way dangerous to the baby. That's just simply—there's just simply nothing there." At this point, the court had already gone beyond what was required; and still, there was no reason to ignore the statutory mandate of Civil Code section 226b for return of the child.

But, without any authority whatsoever, the judge forged ahead: "That doesn't end the case, because on June the 22nd starts not a new period but a continuation of the six months [referring to Civ. Code, § 232, subd. (a) (1)] in which the old rule applies. Now that I've heard your expression of intent of what you've told me you want to do, to wit, I now no longer want to go through with the adoption, now I need to look at your behavior to see how you behaved to see if you have established a parental relationship or desire to communicate with or support or care for the child." Incredibly, the court then determined Stephanie had abandoned her child because she did not make her demand to return the child directly to the W.'s: "*However, I cannot find that they did demand return of the child from the [W.'s] until the actual filing of the petition on July the 18th, 1989.* The [W.'s], in fact, had lawful custody of the child pursuant to a legal adoption proceeding, and it certainly was not in the child's best interests to return the child to the [natural parents] without at least the minimal showing of compliance with the conditions set forth in exhibit 3 [the prospective adoptive mother's handwritten set of requirements for return of the baby]." (Italics added.)

█ Nowhere in the Civil Code is a demand on the prospective adoptive parents a prerequisite for the return of a child. Nowhere in the Civil Code is the parents' alleged behavior after timely signing the refusal to consent a factor for the court's consideration. The mandate of Civil Code section 226b is unequivocal: The child must be returned to the birth mother. There was exactly no evidence of an intent to abandon; there was evidence only that the birth mother contemplated an independent adoption and placed her child with the W.'s solely for that reason. The trial of the parents and grandparents conducted here was unauthorized by law and unnecessary for any purpose.

█ Although not essential to the decision concerning Stephanie's parental rights, we make an additional observation. The superior court was impressed with the legal ramifications of the typed "Statement of Intent" signed by Stephanie after the birth of her child: "[It] certainly evidence[s] an intent, and a knowing intent, to give up the child." The court also

remarked, "In fact, there's an agreement here which recognizes that the adoption was permanent, and that was signed before the birth, and it simply says that Stephanie and the [W.'s] are entering into an open adoption, which this court finds to be and always has found to be an enforceable document . . . ." The court added, "I have found this was an open adoption, and that open adoption agreement was a valid, binding contract. It still exists. [¶] And further, it's not just a contract because the court says it's a contract; the court finds that it was—that it's a good contract, it's a contract that has solid basis for the best interests of the minor child." The court was wrong on several fronts.[4]

First, the open adoption agreement cannot supplant the statutory requisites for an adoption or the official AD 22 form. It could have no force or effect until the adoption was finalized.

Also, Stephanie was a minor when she signed that document, and her subsequent disavowal of the agreement must be recognized. There are several exceptions to the disavowal rule in the context of adoption proceedings, but none applies in this case. Civil Code section 226.1, subdivision (d) does provide that a parent who is a minor has the legal right to consent to an adoption and that "consent shall not be subject to revocation by reason of such minority." Subdivision (a) of that section, however, requires the consent to be "signed in the presence of an agent of the State Department of Social Services or of a licensed county adoption agency on a form prescribed by such department and filed with the clerk of the superior court." This document does not come close to meeting those requisites.

Similarly, the provisions of Civil Code section 224m, governing a minor parent's relinquishment to a licensed adoption agency, do not apply. Thus, there was no statutory impediment to Stephanie's disaffirming the agreement to enter into an open adoption.

---

[4]The court's eagerness to hold Stephanie to the terms of this "contract" did not similarly extend to the W.'s. When Stephanie's attorney asked for continued visitation rights so that the birth parents would have "an opportunity to not be further obstructed from forming a relationship with the child . . . and yet have time accruing in their disfavor for not having contact with the child," both the court and the W.'s' attorney responded in most negative terms. The W.'s' counsel stated the open adoption agreement had "been breached" and that it "would be a most inappropriate time to . . . forcefully bring these people together again and again." He added, "the statute is explicitly clear that termination of parental rights under section 232 terminates parental rights, and it means just what it says."

The court thought there was no point in introducing Stephanie into the child's life under the open adoption agreement until he was "probably two years [old]." Although the judge stated that 15-minute visits with Stephanie alone (not Steven or the grandparents), so long as the W.'s were "close by, like around the door," might be appropriate, he would not make a visitation order. He concluded any visitation was "not [to be] an ongoing or regular matter, except at the discretion of the [W.'s]."

■ In sum, the court erred in finding an abandonment by Stephanie and in appointing the W.'s as guardians for the child. As Stephanie never signed a consent for an independent adoption, the court had no discretion to refuse to return the child to her. (Civ. Code, § 226b.) If the W.'s have concerns about the child's safety, they should report the matter to the department of social services for an investigation. (See *In re Baby Boy B* ■)

### III

■ The father's appeal is easily resolved. He primarily complains of the court's finding that he is not a presumed father. Any issues concerning Steven, as a presumed father or not, are premature: Stephanie has neither relinquished her child to an agency for adoption nor consented to an independent adoption. Thus, there is no need at this point to examine Steven's role in the child's life or in a best interests analysis.

The judgment is reversed. The matter is remanded to the superior court with directions to deny the W.'s petitions and to forthwith restore the baby to the care and custody of Stephanie M., per Civil Code section 226b.[5] (*Guardianship of Rutherford, supra*, 188 Cal.App.2d at p. 209.) Appellants are entitled to costs.

Sonenshine, Acting P. J., and Moore, J., concurred.

Respondents' petition for review by the Supreme Court was denied July 18, 1990.

---

[5] In the context of an appeal, "forthwith" can only mean upon return of the remittitur. If we had the power to make this order effective immediately, we would do so. Pending return of the remittitur, we encourage the parties who, presumably, are all concerned with the best interests of the child, to work toward a smooth transition of custody. The trial court could, and should, make an appropriate temporary order upon the appellants' application. If it declines, we would consider a peremptory writ application, and there we *could* direct an immediate transfer of custody. (Cal. Rules of Court, rule 24(d); *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893].)