[No. G009256. Fourth Dist., Div. Three. Aug. 10, 1990.]

In re TIMOTHY W., a Minor.
ROBERT S. et al., Petitioners and Respondents, v.
ALYSSA W., Objector and Appellant.

[No. G009696. Fourth Dist., Div. Three. Aug. 10, 1990.]

In re TIMOTHY W., a Minor, on Habeas Corpus.

440

**COUNSEL**

Donna L. Groman, under appointment by the Court of Appeal, for Objector and Appellant in No. G009256 and for Petitioner in No. G009696.

Van Deusen, Youmans, & Walmsley and Ted R. Youmans for Petitioners and Respondents in No. G009256 and for Respondents in No. G009696.

Harold LaFlamme and Deborah M. Gmeiner, under appointment by the Court of Appeal, for Minor.

**OPINION**

**CROSBY, J.**— This case is factually and legally similar to *In re Baby Boy B.*█ (Cal.App.) and *In re Baby Boy M.* (1990) 221 Cal.App.3d 475 [272 Cal.Rptr. 27]. Again we must emphasize the importance of complying with the law of independent adoptions as it is written. The Legislature, not the courts, establishes the law to be applied in these matters. Yet this is the third case in as many months in which we encounter a gross misapplication of a reasonably clear-cut legislative scheme. To repeat, when a natural mother refuses to consent to an independent adoption within a reasonable time after placing the child with prospective adoptive parents, and six months will *always* be a reasonable time, the court may not consider whether returning the child to the birth mother will be in the minor's best interests. (*Ibid.*) We now direct the transfer of this minor to his mother on her appeal and make that transfer effective immediately via her petition for writ of habeas corpus.

I

Fifteen-year-old Alyssa W. gave birth to a son on May 25, 1989, in San Diego. She made arrangements beforehand through a licensed independent

adoption agency to place the baby with the S.'s, who reside in Orange County. The natural father was a teenager with whom the birth mother had a brief relationship.

Alyssa and the S.'s signed a Department of Social Services' "Health Facility Minor Release Report" (designated as form AD 22). The form was not included in the record on appeal and was not an exhibit. Nevertheless, the standard form we have reviewed in other cases does have a boldface heading, " 'IMPORTANT NOTICE' " and then states it " 'is not a relinquishment or consent for adoption.' " (See *In re Baby Boy M., supra*, 221 Cal.App.3d 475, 478.) The notice adds, that " 'there are two basic ways a child may be placed for adoption.' " If the child is given up to a licensed adoption agency, " 'the relinquishment may not be rescinded except by mutual agreement.' " If, on the other hand, " '[t]he parent [] place[s] the child directly with adoptive parents . . . the [birth] parent retains all responsibility for the child's custody and control until the court issues the adoption decree. *The parent has the right to reclaim the child at any time prior to signing the consent to the adoption*. Once the consent to the adoption by the [adoptive parents] is signed by the birth parents(s) in the presence of a representative of the Department of Social Services or a licensed public adoption agency it may be withdrawn only with court approval.' " (Italics added; see Civ. Code, §§ 224m, 226b, 226.11.) Alyssa would have acknowledged she was " 'releasing [her] child from the hospital for the purpose of [] Adoption Planning.' " The form also provides the birth mother " 'retains all parental rights to [the child's] custody' " and authorizes the prospective adoptive parents " 'to make provisions for medical and surgical care for [the] child . . . for a period not to exceed six months from the date of [the] child's release from [the] hospital.' " (*In re Baby Boy M., supra*, 221 Cal.App.3d at p. 478.)

Above the prospective adoptive parents' signatures, the form provides, " 'I/we understand that this authorizes only the release of this child from the hospital. This is not a consent or relinquishment of this child for adoption.' " (221 Cal.App.3d at p. 479.)

Timothy was released from the hospital to the S.'s care. They filed the petition for an independent adoption on June 7, 1989. The State Department of Social Services was notified per Civil Code section 226b, and the assigned caseworker initiated contact with Alyssa. In a report filed with the court on October 17, 1989, the caseworker noted she spoke to her on August 16. At that time, the birth mother "had second thoughts about consenting to the adoption. She stated that she felt pressured by the counselors and the attorney to give her child up for adoption." The following month Alyssa's mother told the caseworker her daughter wanted her baby

back. Several weeks later, Alyssa "informed this worker that she wanted to reclaim her child and that she would sign the Refusal to Consent to the Adoption form [form AD 20]. Alyssa was advised to write a letter to the court stating her intentions and to seek legal consultation."

The caseworker's next report was written on October 31, 1989, and filed with the court on November 2. The caseworker noted she had an appointment with the birth mother on November 1 to execute the AD 20 form. A follow-up report filed with the court on November 6 detailed her meeting with Alyssa and her mother and included the signed AD 20 form. The caseworker related that Alyssa's mother "will support her daughter in her decision to reclaim the minor. The maternal grandmother stated that she will find an attorney in order to fight for legal custody of the child."

Alyssa wrote a letter to the Clerk of the Orange County Superior Court to advise she would not consent to the adoption. The letter was filed on November 21, 1989.

Timothy W. became six months of age on November 25, 1989. This significant date triggered the filing of the following pleadings: On November 27, the prospective adoptive parents petitioned to sever Alyssa's parental rights, claiming abandonment under Civil Code section 232, subdivision (a)(1). The following day, she filed a petition for writ of habeas corpus to obtain the return of the baby. An ex parte motion filed by the S.'s to consolidate the last two petitions with the pending adoption matter was granted. The court issued an order to show cause, but forbade the birth mother or "anyone acting in her behalf [from] us[ing] means of selfhelp to secure physical possession of the minor child."

The S.'s also petitioned for temporary guardianship of Timothy pending resolution of the judicial proceedings. By this time they had received copies of Alyssa's records from the independent adoption agency, including psychological evaluations and a letter written by Alyssa's treating psychologist to the S.'s attorney detailing her professional relationship with the birth mother and her recommendations for placement of the baby based on the infant's best interests. The guardianship petition noted the prospective adoptive parents "have grave concerns and are extremely fearful of what could physically and emotionally happen to this child if we are forced to release him to the custody of Alyssa." This petition was followed by an amendment to the Civil Code section 232 petition to add a new ground for termination of the birth mother's rights under subdivision (a)(6), "a mental incapacity or disorder which renders [her] unable to adequately care for and control the child." Finally, the prospective adoptive parents filed a petition to determine the parental rights of Timothy's natural father.

The filing of the petition to terminate Alyssa's parental rights obligated the county probation department to prepare a report and make a recommendation to the court for disposition. A probation officer interviewed the parties, and the report reflects their various histories and statements. It concludes with a boilerplate and misleading recommendation: "It is respectfully recommended that the court make findings on the Petition based on the evidence and testimony presented in court and based on that evidence and testimony, an order be made which would serve the minor's best interests."

The habeas petition, Civil Code section 232 petition, and guardianship petition were consolidated for hearing. The court and parties agreed to bifurcate that portion of the Civil Code section 232 petition seeking to terminate the birth mother's rights on the basis of mental incapacity. (Civ. Code, § 232, subd. (a)(6).) The hearing continued over six court days in January 1990. The court denied the petition for writ of habeas corpus and terminated the birth mother's parental rights on the ground she had left the child "in the care and custody of another for a period of six months . . . with the intent . . . to abandon [him]." (Civ. Code, § 232, subd. (a)(1).) Although the court made what it termed a "gratuitous finding" on the guardianship petition as well, it eventually concluded that issue was mooted by the termination of the birth mother's parental rights.

Alyssa appealed from the judgment terminating her rights. After this court issued its opinions in the cases of *In re Baby Boy B.,*█ and *In re Baby Boy M., supra,* 221 Cal.App.3d 475, she also petitioned for a writ of habeas corpus. We ordered the appeal and writ petitions consolidated and issued an order to show cause. After having heard argument, we now grant the relief prayed in each.

## II

In some adoptions the child is placed with prospective adoptive parents by transferring custody to a licensed agency or after execution of a written consent to the adoption.[1] Either procedure leaves the prospective adoptive parents with considerable assurance that a child received into their home is likely to stay: If a birth mother changes her mind after formally consenting to the adoption, her consent "may not be withdrawn except with court approval." (Civ. Code, § 226a.)

In determining whether to permit the birth mother to withdraw her consent, Civil Code section 226a requires courts to consider the best

[1] Although an adoption agency was involved here, it never had custody of the child.

interests of the child: "Consideration of the best interests of the child shall include, but not be limited to, an assessment of the child's age, the extent of bonding with the prospective adoptive parent or parents, the extent of bonding or the potential to bond with the natural parent or parents, and the ability of the natural parent or parents to provide adequate and proper care and guidance to the child." (*Ibid.*)

In many independent adoptions, however, the child is released to prospective adoptive parents before the birth mother has formally consented to an adoption. The releasing document is the AD 22 form described in part I of this opinion. That document gives the prospective adoptive parents "only the right to temporary physical custody" of the child. (*Rogers* v. *Platt* (1988) 199 Cal.App.3d 1204, 1213 [245 Cal.Rptr. 532].) It does not elevate the status of a prospective adoptive parent to "a person acting as a parent." (*Id.*, at p. 1212.)

The tenuous status of the prospective adoptive parents is reflected in statutory procedures for return of a child placed with them by virtue of the AD 22 form. When a birth parent who has executed only that form has a change of heart, she or he may execute a "Refusal to Consent to Adoption" form (otherwise known as an "AD 20" form). In that eventuality, Civil Code section 226b applies: "In any adoption proceeding in which the parent has refused to give the required consent . . . the court shall order at the hearing the child restored to the care and custody of the natural parent."

The significance of the differences between the language in Civil Code section 226a, which applies when a parent has already signed the consent to adopt, and section 226b, which concerns a parent who has signed a refusal to consent cannot be overstated. In the former situation, the decision by the court to proceed with or terminate the adoption process is based on the best interests of the child; i.e., the court can determine whether bonding has occurred and is entitled to make a value judgment as to the quality of life the child can anticipate with the party who will be chosen to parent.

Where the birth mother has never consented to an adoption and has formally refused to give her consent, however, the Legislature has provided that the court *shall* order the adoptive parents to relinquish the child. (Civ. Code, § 226b.) As we recently noted, "[t]he mandate of Civil Code section 226b is unequivocal: The child must be returned to the birth mother." (*In re Baby Boy M., supra*, 221 Cal.App.3d at p. 485.) There is simply no

discretion to consider whether the child has bonded to the prospective adoptive family or who will provide a better home.[2]

■ While the statutes which apply to adoptions where consent has been given and those where consent has been refused are quite clear, there is one area which remains ambiguous: The Legislature has not explicitly required a birth mother to conclusively make up her mind about adoption within any particular period of time. Reference to related statutory provisions has resulted in a de facto six-month cutoff period. (*Baby Boy M., supra*, 221 Cal.App.3d at p. 481.) This is so largely because legal abandonment by a birth parent cannot be established in fewer than six months. (Civ. Code, §§ 232, subd. (a)(1), 224, subd. 1(a).) But a birth parent's conduct "in contemplation of a proposed adoption [cannot establish] desertion or [an] intention to abandon . . . . To hold otherwise would frustrate the underlying policy of the adoption statute which decrees that the relationship between the natural mother and her child should not be terminated through an adoption proceeding unless and until the mother has indicated her consent thereto in writing." (*Guardianship of Rutherford* (1961) 188 Cal.App.2d 202, 208 [10 Cal.Rptr. 270, 98 A.L.R.2d 410].)

For this reason, many cautious legal practitioners will advise a birth mother she has only six months to decide whether to proceed with the adoption. But there is no such hard and fast rule, and nothing we said in *Baby Boy M.* should be so interpreted. Even after six months, in an independent preadoption placement, mandatory return to the nonconsenting parent will be the general rule. (See, e.g., *Adoption of Parker* (1948) 31 Cal.2d 608, 617 [191 P.2d 420] [Supreme Court determined the birth mother never consented to adoption and ordered child's return to her *eight years* after his birth; opinion did not "preclude appropriate proceedings" to terminate her parental rights under the theory of abandonment].)

■ Counsel for the minor suggests Timothy has been denied due process and equal protection under the law because the court was not required to consider his best interests before ordering his return to Alyssa. By contrast, she argues, a child whose birth mother had consented to the adoption would be entitled to a best interests determination. But children have no constitutional right to be adopted. Natural parents, on the other hand—even those less suited to parenthood than any available prospective adoptive

---

[2] This is the distinction the trial judge has persistently refused to recognize. Rather than honor a birth parent's execution of the standard AD 20 form, he has held a "refusal to consent" can occur only when the birth mother makes a personal demand on the prospective adoptive parents to return the child. The court has compounded the error by basing its decision on the best interests of the child when Civil Code section 226b does not authorize consideration of that factor.

parent—have a fundamental right to raise their children. In recognition of that constitutional right, the law currently gives birth mothers the option to choose an alternative that provides at least six months to decide whether to proceed with an adoption. She could take even longer by simply arranging for another to care for the child and providing support and maintaining some contact. (See Civ. Code, § 232, subd. (a)(1).) We find no viable claim for denial of equal protection or due process. Questions concerning the propriety of these procedural distinctions should be directed to the Legislature, not the courts.

■ We also reject the argument by minor's counsel that "from the child's perspective, there is nothing to distinguish a placement in anticipation of adoption from an abandonment." The contention ignores the facts of this case, as well as those in *Baby Boy B.*■ and *Baby Boy M.* In all three cases, the birth mothers refused to consent to the adoption *before* the children were six months old. The children should have been returned to the birth mothers before they attained the age of six months. And when a child has been out of a birth parent's custody for less than six months, there can be no abandonment.

But in all three cases, the prospective adoptive parents refused to relinquish custody of the children. The ill-advised actions of the prospective adoptive parents, presumably on the advice of counsel, were contrary to the best interests of the children. The birth mothers cannot be penalized for the irresponsible conduct of those who sought to thwart their constitutional and statutory rights. And the prospective adoptive parents cannot profit from their unauthorized conduct.

It may be redundant to reiterate our holding; but we do not wish to see another case of this nature: A birth parent's execution of an AD 20 form tolls the six months for purposes of an abandonment under Civil Code section 232, subdivision (a)(1). It is an unequivocal demand for return of the child. As we have said before, "Nowhere in the Civil Code is a demand on the prospective adoptive parents a prerequisite for the return of a child." (*In re Baby Boy M., supra,* 221 Cal.App.3d at p. 485.)

■ Where the birth mother has never consented to an adoption, the prospective adoptive parents have no constitutional or statutory right to maintain a parent-child relationship. For the six months' duration of the AD 22 form, the prospective adoptive parents' "temporary physical custody [is] permissive, but their retention of the child [becomes] unlawful when they refuse[] to return the child upon [the birth mother's] request." (*Rogers v. Platt, supra,* 199 Cal.App.3d at p. 1213.)

When consent is refused, the law does not permit a court to examine the best interests of the child in making a custody determination. Issues of bonding and lifesyles of the birth parents and their families are totally irrelevant in a proceeding which is to be limited only to effectuating the unconditional return of the child to his or her birth mother. Thus, retention of the child after a birth parent has refused to consent to an adoption only worsens an already tragic situation: The child remains longer in the adopting parents' home, only increasing the pain when he or she is inevitably removed per the mandate of Civil Code section 226b.

## III

■ The prospective adoptive parents alternatively petitioned to terminate Alyssa's rights under subdivision (a)(6) of Civil Code section 232. The court deferred a hearing on that issue. While nothing we have reviewed in conjunction with these proceedings would even remotely justify a termination of parental rights on that basis, the issue is not presently before us. In any event, the pendency of such a petition, by itself, does not affect the court's duty under Civil Code section 226b to return a child to a birth parent who has refused to consent to an adoption. If there is anything to the allegations concerning the mother's mental health requiring immediate action, that is more appropriately the subject of a Welfare and Institutions Code section 300 proceeding brought by disinterested county authorities.

The S.'s also petitioned for temporary guardianship of the baby. The record is considerably muddied on this aspect of the case. Once parental rights are terminated under Civil Code section 232, the court is required to "take one of the following actions: [¶] (a) Appoint a guardian of the minor . . . ." (Civ. Code, § 239.) The court did so here, naming the S.'s as Timothy's guardians.

■ As we have determined there was no statutory basis for terminating the birth mother's rights, it should be a simple matter to reverse the guardianship as well. But in announcing the termination of Alyssa's parental rights, the court purported to "go further and find a separate and independent ground to grant the guardianship. Were the 232(a)(1) not actually granted, I would have granted the guardianship, a permanent guardianship, finding that it would be both in the best interests of young Timmy that I grant the guardianship, good cause having been shown, and that it would be detrimental to return Timmy to his natural parents—natural mom, even if there was no—even if there was no abandonment. [¶] And I make a note that I would be doing that with a kind of a reunification plan, which I'd tell you more about later. However, that's a totally independent ground. It's totally gratuitous."

The court never presented the parties with any "reunification plan." And, when pressed by Alyssa's attorney, the judge retreated from his expressed position: "[Counsel for birth mother]: Again, for my clarification, my understanding is that the court's ruling on the termination issue here today made moot the guardianship proceeding. [¶] The court: Yes. It really renders moot the guardianship proceeding. The guardianship that I granted is under [Civil Code section] 239, which is statutory. [¶] [Counsel]: Yes. [¶] The court: And everything else I said about guardianship's really gratuitous. Doesn't mean that it was denied. It's just moot, just not necessary. [¶] [Counsel]: Yes. [¶] The court: It's a vehicle that's no longer necessary. [¶] [Counsel]: That was my understanding. For all effective purposes, those two issues are completely terminated as of today. The only remaining issue or bifurcated portion of the lawsuit is the [petition to terminate the birth mother's rights under Civil Code section 232, subdivision] (a)(6). [¶] The court: Well, I'm not so sure, because, see, [section] 239 says that the court shall appoint the pre-adoptive parents as guardian, and they already have a guardianship, so really they are appointed as guardians. [¶] [Counsel]: Yes, I understand that. [¶] The court: So it's ongoing. [¶] [Counsel]: The guardianship is ongoing, but the lawsuit, that portion of the lawsuit is now effectively terminated. [¶] The court: Essentially. [¶] [Counsel]: All right. *I'm only obviously interested in the record and the timing for the appellate process.* [¶] The court: *For appellate process, I would—well, I don't know. I won't make a decision on it.* [¶] Go ahead. Anything else?" (Italics added.)

The S.'s argue the court's comments constitute a legal conclusion that release of the child to his birth mother would be detrimental, thus providing an alternative ground for affirming the court's judgment terminating her parental rights. The defects in the contention are several. First, despite his rhetoric, the judge retreated from his initial position and advised the parties he was not "mak[ing] a decision on" the issue. The judge's express disavowal of a ruling leaves us with no choice but to ignore the language he himself termed "gratuitous."

■ Moreover, there is no substantial evidence in the record to justify a finding of detriment. The only evidence even remotely relevant on that point came in the form of testimony and reports by the birth mother's therapists from the adoption center. And that evidence was improperly received over her objection because it violated the psychotherapist/patient privilege. (Evid. Code, § 1014.)

The court overruled Alyssa's objection, finding a waiver based on her execution of three purported releases.[3] The first document is limited to medical care of mother and baby. It is insufficient as a matter of law to constitute a waiver of her psychotherapist/patient privilege for present purposes. The third document, of course, only applies to a release of information to the child once he reaches the age of 18. Release of information before that time is authorized only if necessary for the "child's welfare," and that can *only* be "nonidentifying" information.

The second release specifically mentions the psychotherapist/patient privilege and under certain circumstances could perhaps justify a release of information of the sort received by the court. But the document only authorized a release of information to *facilitate* the adoption. Once the birth mother signed a refusal to consent, there was no longer an adoption to facilitate.

The adoption center personnel clearly violated their obligation to their patients, Alyssa and her mother, by releasing the documents pursuant to a subpoena duces tecum and agreeing to testify as experts on behalf of the prospective adoptive parents. The therapists' actions in providing written evaluations of the birth mother to the attorney for the prospective adoptive parents and testifying at his behest are indefensible in our opinion.

---

[3] All three releases are prepared on the adoption center's letterhead. Two are dated "4/29/89," several weeks before Timothy's birth; the third is undated. The first release provided, "TO WHOM IT MAY CONCERN: [¶] I give you permission to speak with Cynthia D. Martin, Ph.D., Rebecca F. Leverant, M.S., Jonathon P. Collopy, M.S., Carla L. Brueggeman, Ph.D. and Mary D. Framo, Ph.D. about my medical care and that of my baby."

The second release is addressed to the five individuals identified in the first release plus one Margaret M. Esgate, Ph.D. It reads, "I give you permission to speak with potential adopting parents about me in order to help me find an appropriate home for the child I am considering placing for adoption. In addition, I give you permission to speak with the adopting parents I choose to place my child with in order to help make that placement work smoothly. I also give you permission to speak with the attorney who is helping with the legal aspects of this adoption. I further understand that you will be discussing my medical care with my physician during my pregnancy and after the delivery, as well as with the hospital staff at the hospital when my child is born. I understand the confidential relationship between psychotherapist and patient which is provided for under the law necessitates me specifically agreeing to waive that privilege in order for you to help me in the adoption process."

The third release is addressed to the adoption center itself: "TO: A Center for Adoption, Youth and Family Counseling [¶] I give permission for you to release information about me to the child I placed for adoption. This would include medical information, last known address, and anything that would be helpful in terms of the child's understanding of this adoption. I understand that this information would be released only if the child were over the age of eighteen. If for some reason, some portion of this information were important for the child's welfare, the Center would give the child information about me except for identifying information. At any time this information is released, the Center would attempt to contact me, but I understand it is my responsibility to keep the Center informed of my current address in order for this to occur."

The judgment is reversed. The matter is remanded to the superior court with directions to deny the S.'s petitions to terminate the birth mother's parental rights and for a temporary guardianship and to restore the child to Alyssa.[4] A writ of habeas corpus shall issue making the change in custody final forthwith. Appellants are entitled to costs.

Sonenshine, Acting P. J., and Wallin, J., concurred.

Respondents' petition for review by the Supreme Court was denied December 20, 1990.

---

[4] Of course, the Civil Code section 232, subdivision (a)(6) claim remains to be tried, at least in theory. Although that issue was allegedly bifurcated, the mother was, we are certain, smeared with all the evidence available to support it. And the trial court found no basis for such a finding, though it declined to specifically rule because the issue was moot.

We have examined the evidence received to this point and find it wholly insufficient to support a claim of mental incapacity or defect. Most of the birth mother's troubles stem from the stubborn refusal of the adults involved here to respect her wishes. Dragging this case on for further proceedings would not be in the best interests of any of the affected parties, in our view. If the prospective adoptive parents claim there is significant additional evidence to support the remaining allegation they may proceed; on this record, however, the claim appears to be completely without merit. (See Code Civ. Proc., § 128.5.)