Filed 7/3/13  In re Hunter B. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re HUNTER B., a Minor. | D063416 |
| ROBERT A., | |
| Petitioner and Respondent, | (Super. Ct. No. AN14400) |
| v. | |
| JASON B., | |
| Objector and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Objector and Appellant.

Lloyd S. Costales for Petitioner and Respondent.

Jason B., the biological father of Hunter B., appeals a judgment terminating his parental rights on the basis of abandonment under Family Code section 7822[1] so that Hunter can be adopted by her stepfather, Robert A. Jason contends that he did not "leave" Hunter in the care and custody of another person and did not intend to abandon her within the meaning of the statute. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Hunter, who is currently three years old, is the child of Melissa A. and Jason. The parents met and began dating in March 2009. They moved in together two months later and Melissa became pregnant in September 2009. Hunter was born the following June. In early August 2010, Jason and Melissa separated and Melissa and Hunter moved out of the couple's house and into Melissa's father's house. Jason visited Hunter regularly for the first few weeks in August. Jason picked up Hunter from her grandfather's house and picked up his son Nathan B., Hunter's half brother, from kindergarten. The three would spend the afternoons and evenings together before Jason returned Hunter to Melissa. Melissa did not allow Hunter to stay overnight with Jason because she was concerned that Jason's medical issues (degenerative disc disease that was the result of his military service) would cause him to go to sleep and not wake up if Hunter was crying.

Near the end of August, Melissa asked Jason to sign a custody agreement. Jason refused. Melissa withheld Hunter from Jason after his refusal to sign the agreement, but did bring Hunter to Nathan's birthday party on August 28, 2010. At the party, Jason took

---

[1]     All further statutory references are to the Family Code.

Hunter from Melissa so that Hunter could spend the rest of the weekend with him and Nathan. Jason told Melissa that he would return Hunter to her the following Monday. Melissa did not agree to Jason's plan. Against Melissa's wishes, Jason passed Hunter to a friend who was nearby in a truck. Jason's friend drove away with Hunter on her lap, not restrained in a child safety seat, while Jason held Melissa back. Jason then left with the friend and Hunter, and Melissa called the police. That evening, Jason was arrested and charged with kidnapping and assault.

The following month Melissa sought and was granted a temporary restraining order against Jason. On October 4, 2010, the restraining order was made permanent and Melissa was awarded full custody of Hunter. Jason was granted four hours per week of supervised visits at his expense. Jason made one child support payment in October, but did not arrange any visits with Hunter or send her any cards, gifts or letters until June 2011. That month, he had one visit with Hunter on her first birthday and brought her a gift.

The same month, Melissa and Jason attended a court-ordered mediation session. Melissa did not want the existing custody order changed and expressed fear about Jason's ability to care for Hunter by himself. Jason told the mediator that he could not afford to pay for supervised visits and requested unsupervised visitation rights. The mediator recommended increasing Jason's visitation to 16 hours per week and also recommended that the court require Jason and Melissa to agree on an unpaid supervisor. Following the mediation, the court increased Jason's visitation as recommended by the mediator and

3

modified the visitation order to allow supervision "*by any mutually agreeable third party or a professional at father's cost.*" (Italics added.)

Melissa and Robert were married on June 26, 2011, and Melissa and Hunter moved in with Robert. At that time, Robert became the sole financial provider for Melissa and Hunter. Despite the change in the visitation order, Jason did not arrange any visits with Hunter, pay any support or send any cards or letters to Hunter after her first birthday. Hunter continued to see Nathan, whose mother arranged visits with Melissa. Jason's mother sent Hunter birthday gifts and money on a few occasions for Melissa to purchase items for Hunter. Jason testified that he also sent gifts to Hunter when Nathan visited with her, but Melissa testified that Jason had not sent any gifts, cards or letters to Hunter after her first birthday and that there was no indication that any gift sent by Jason's mother had been sent on Jason's behalf.

After his arrest in August 2010, Jason's financial situation deteriorated. He lost his job and, although he received a modest monthly disability payment from the Veteran's Administration, he lived out of his car from August 2011 to January 2012. Jason eventually pled guilty to a misdemeanor as a result of the August 2010 arrest and served 45 days in jail in January and February of 2012. After his release from jail, Jason enrolled in a veteran's assistance program, which provided housing and helped Jason obtain additional disability benefits.

On July 13, 2012, Robert filed a petition for freedom from parental custody and control, seeking to terminate Jason's parental rights to Hunter under section 7822 so that Robert could adopt her. Also in July 2012, Jason contacted the visitation supervisor to

4

arrange a visit with Hunter. On the advice of her counsel, Melissa refused to agree to the visit. In September 2012, Jason submitted a letter to the court opposing Robert's petition, and the court appointed counsel for both Jason and Hunter. The San Diego County Health and Human Services Agency prepared a report for the section 7822 proceeding recommending that Jason's parental rights be terminated.

A trial on the petition was held on December 21, 2012. Melissa, Robert and Jason testified. At the close of the proceedings, the court granted the petition to terminate Jason's parental rights, finding that Jason's testimony was not credible and finding by clear and convincing evidence that the elements of section 7822, subdivision (a)(3) had been satisfied.

DISCUSSION

A proceeding to have a child declared free from the custody and control of a parent may be brought under section 7822, subdivision (a)(3) where the child has been left by one parent "in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (*Id.*, subd. (a)(3).) A parent's "failure to provide support, or failure to communicate" with the child for a period of one year or more "is presumptive evidence of the intent to abandon. If the parent . . . [has] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent . . . ." (*Id.*, subd. (b).) "The parent need not intend to abandon the child permanently; rather, it is sufficient that the parent had the

5

intent to abandon the child during the statutory period." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68 (*Amy A.*).)

"The fact that a parent has not communicated with a child . . . or that the parent intended to abandon the child does not become material . . . unless the parent has 'left' the child" within the meaning of section 7822. (*In re Jacklyn F.* (2003) 114 Cal.App.4th 747, 754 (*Jacklyn F.*).) A parent " 'leaves' " a child by voluntarily surrendering the child to another person's care and custody. (*Amy A., supra*, 132 Cal.App.4th at p. 69; *In re George G.* (1977) 68 Cal.App.3d 146, 160.) Conversely, "abandonment does not occur when the child is taken from parental custody against the parent's wishes." (*In re George G.*, at p. 160.) Abandonment is a factual question that we review for substantial evidence, keeping in mind that all of the trial court's findings must be made by clear and convincing evidence. (*Amy A.*, at p. 67; *In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1211.)

Jason maintains that the evidence shows that he did not "leave Hunter with Melissa within the meaning of section 7822" and that the evidence was insufficient to establish that he intended to abandon her. He contends that he did not voluntarily leave Hunter and that his absence from Hunter's life was the result of the restraining order. He argues that his failure to support or communicate with Hunter is excused by his inability to afford a professional supervisor for visits and Melissa's frustration of his efforts to find a mutually agreeable nonprofessional third-party supervisor. Jason also argues that termination of his parental rights is not in Hunter's best interests.

6

As Jason points out, in determining whether the minor was " 'left,' " the important element is "the voluntary nature of a parent's abandonment of the parental role . . . ." (*Amy A., supra*, 132 Cal.App.4th at p. 69.)  Thus, "a parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order [citation]; however, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child [citation]."  (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 504; see also *Amy A.*, at p. 70 [parent's "repeated inaction in the face of the custody order provides substantial evidence that he voluntarily surrendered his parental role and thus 'left' [the child] within the meaning of section 7822"]; *In re Jack H.* (1980) 106 Cal.App.3d 257, 264; *In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 815-816.)  "Simply stated, 'nonaction of the parent after a judicial decree removing the child may convert a [judicial] "taking" into a "leaving" [of a child by the parent].' "  (*In re Marriage of Jill & Victor D.,* at p. 504.)

Jason relies on *Jacklyn F.* to support his contention that he did not voluntarily leave Hunter.  In *Jacklyn F.*, the paternal grandparents filed a petition for guardianship in October 1998, three days after the mother left the seven-year-old minor with them. (*Jacklyn F., supra,* 114 Cal.App.4th at p. 749.)  The following month, the trial court granted temporary guardianship of the child to the grandparents, against the mother's wishes.  (*Ibid.*)  In April 1999, the grandparents obtained a restraining order against the mother.  Although the mother was permitted limited visitation under that order, she visited her daughter just once that year.  (*Id.* at p. 750.)  The mother testified that she

"was told she was not allowed to have any contact with the minor except by mail." (*Id.* at p. 752.) In 1999 and during the following two years, the mother sent " 'stacks' of letters" to her daughter, which the grandparents withheld from the minor. (*Id.* at pp. 756, 752.) In 2002, the mother filed a request for supervised visitation, telephone contact and counseling with her daughter. The grandparents filed a competing petition to terminate mother's parental rights under section 7822. The trial court granted the grandparents' petition and terminated the mother's parental rights. (*Id.* at p. 753.)

On appeal, the court held that the mother had not left her child within the meaning of section 7822. (*Jacklyn F., supra,* 114 Cal.App.4th at p. 756.) The court concluded that the mother had not " 'left' " the child, but instead, that "the minor's custody status became a matter of judicial decree, not abandonment." (*Ibid.*) In reaching this conclusion, the *Jacklyn F.* court emphasized the mother's attempts to remain in her daughter's life by frequently sending her letters after the entry of the judicial custody order. The court pointed out, however, that under different circumstances "it might be proper to conclude that a parent has 'left' a child . . . despite court intervention . . . ." (*Ibid.*)

Jason's contact with Hunter was not foreclosed by the issuance of the restraining order. The initial order provided Jason with four hours of supervised visitation per week at his expense. Jason did not avail himself of the opportunity to visit Hunter until his mother paid for a supervised visit on Hunter's first birthday, nearly eight months after the issuance of the order. After this visit, the court modified the restraining and custody order to provide for 16 hours of supervised visitation per week, and permitted the

8

supervisor to be a nonprofessional third-party agreed to by Jason and Melissa. Jason did not arrange any visits with Hunter over the course of the next year after the order was modified.

Jason acknowledges that he did not see Hunter and that he provided no child support for her in the year following her first birthday. He contends that he did send gifts to Hunter through Nathan, and that Melissa's unwillingness to agree to a third-party supervisor and his financial circumstances prevented him from seeing his daughter. However, the trial court was entitled to credit Melissa's testimony that she did not receive any gifts for Hunter from Jason. (*Amy A., supra*, 132 Cal.App.4th at p. 71.) Although Jason may have been unable to afford a professional supervisor for visits with Hunter, there is no evidence in the record that would support his contention that Melissa frustrated his ability to visit Hunter at no cost by refusing to agree to a third-party supervisor. At trial, Jason's counsel asked Melissa just one question concerning this issue: "Why is it that you couldn't agree on somebody, a family member?" Melissa's answer to this question, "No, uh-huh," was not responsive and does not support Jason's contention that Melissa was unwilling to agree to a third party to supervise visits.

Jason also relies on his own testimony that he believed he could not contact Melissa directly to discuss an appropriate third-party supervisor without violating the restraining order, and that he did not know how to ask the court for a modification. However, the order provided for "brief and peaceful contact as required for court-ordered visitation" of Hunter. Further, Jason recognizes that the restraining order did not

9

preclude him from discussing this issue with Melissa, and he presented no evidence that Melissa prevented him from doing so.

While the restraining order limited Jason's contact with Hunter, Jason failed to arrange visits, send letters or cards to Hunter or pay any support. This voluntary inaction on his part supports the trial court's finding that Jason "left" Hunter within the meaning of section 7822.

## II

Jason argues that even if there is substantial evidence to support the trial court's determination that he left Hunter, we should reverse the order terminating his parental rights because there was insufficient evidence to support the court's finding that he intended to abandon her.

As we previously discussed, the "failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon." (§ 7822, subd. (d).) Jason does not dispute that he had no direct communication with Hunter or that he provided no child support for her during the one-year period preceding Robert's filing of the petition. Jason argues, however, that the evidence shows that he never intended to abandon Hunter during his year-long absence from her life because during that year, he was "doing everything he could to get back on his feet financially. . . ." Citing *In re Baby Boy M.* (1990) 221 Cal.App.3d 475, 482 and *In re Cattalini* (1946) 72 Cal.App.2d 662, 667, Jason also contends that his inability to pay support rebuts any presumption of intent to abandon Hunter based on his failure to do so.

10

In its ruling, the juvenile court looked to the evidence of Jason's actions (or inactions) in concluding that the element of intent to abandon was established. Jason's statements that he did not intend to abandon Hunter are belied by the undisputed facts that Jason did not take any steps to exercise his visitation rights or to support Hunter for the statutory period. This constitutes sufficient evidence to support the court's findings that he left Hunter for a period of more than one year and that he intended to abandon her. (See *Amy A., supra*, 132 Cal.App.4th at pp. 71-72; *In re Marriage of Jill & Victor D., supra,* 185 Cal.App.4th at p. 504.)

With respect to Jason's inability to pay, *In re Baby Boy M.* does not foreclose the trial court's finding of abandonment. Jason relies on that court's statement that " 'failure to pay for maintenance when no demand therefor[e] has been made [citations], or no ability to provide is shown [citations], by itself, does not prove an intent to abandon.' " (*In re Baby Boy M., supra*, 221 Cal.App.3d at p. 482.) However, it is not Jason's failure to pay support, by itself, that supports the court's finding of abandonment, but also his failure to communicate at all with Hunter after her first birthday.[2] *In re Cattalini* similarly does not support Jason's argument that his inability to pay precludes a finding of abandonment. In that case, it was the mother's refusal to accept support from the father, not his inability to pay, that rebutted the presumption of abandonment. (*In re Cattalini, supra*, 72 Cal.App.2d at pp. 666-667.)

---

[2]     Additionally, *In re Baby Boy M.* did not concern whether the parent had paid support during the statutory period. Rather, the case involved the return of the child to her natural parents who acted to reclaim their son from his prospective adoptive parents within six months of his birth. (*In re Baby Boy M., supra*, 221 Cal.App.3d at p. 483.)

Jason argues that even if the court's abandonment finding is supported by sufficient evidence, termination of his parental rights is not in Hunter's best interests. Section 7890 provides that when a court hears a petition to free a child from the custody and control of his or her parent, "the court shall consider the wishes of the child, bearing in mind the age of the child, and shall act in the best interest of the child." (See also § 7801 [mandating liberal construction of the law in freedom from parental custody and control proceedings "to serve and protect the interests and welfare of the child"].)

The evidence supports the court's finding that adoption is in Hunter's best interests. Hunter is happy and healthy in Melissa and Robert's home. She views Robert as her parent and calls him "daddy." She has not seen Jason since her first birthday. The social worker who assessed the situation believed that it was in Hunter's best interests to terminate Jason's parental rights. Jason introduced no evidence to the contrary.

## DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

McINTYRE, Acting P. J.

O'ROURKE, J.