[No. H017530. Sixth Dist. May 26, 1999.]

Guardianship of ZACHARY H., a Minor.
ROBIN S. et al., Petitioners and Respondents, v.
ERIC P., Objector and Appellant.

**COUNSEL**

Law Offices of Francis & Associates and Richard L. Francis for Objector and Appellant.

Jane A. Gorman for Petitioners and Respondents.

**OPINION**

**PREMO, J.**—Eric P., biological father of Zachary H., successfully resisted petitions to terminate his parental rights and to adopt Zachary filed by Robin

and Joanne S.[1] The trial court, however, granted a guardianship petition and appointed Robin and Joanne as Zachary's guardians. Eric appeals from the order. He essentially contends that the trial court erred by denying him custody in the absence of a showing of unfitness. We disagree and affirm the order.

BACKGROUND

This case has a long and unfortunate history that we have recounted through December 8, 1995. (*Adoption of Zachary H.* (Oct. 28, 1996) H014891 [nonpub. opn.].) To provide context, we reiterate facts to some extent before bringing the case up to date.

Zachary's mother and Eric were estranged lovers. Zachary was born on August 10, 1994, and the mother immediately placed him with Robin and Joanne as prospective adoptive parents. Eric had already filed a petition to determine his paternity (on Aug. 1, 1994). Robin and Joanne filed a petition for adoption on August 12. Their lawyer gave no notice to Eric.

Zachary's mother appeared in Eric's paternity action via the same lawyer who represented Robin and Joanne. Because Eric was absent from a court hearing, she secured a dismissal on January 30, 1995.

Robin and Joanne filed a petition to terminate Eric's parental rights on February 21, 1995. Their lawyer gave no notice to Eric. The petition was granted on April 6. Again no notice was given.

The trial court set aside the dismissal of Eric's paternity action on August 14, 1995, and the order terminating Eric's parental rights on October 26. It then held a trial of all three actions on November 1 and 2. It concluded that Eric was Zachary's biological father but not Zachary's presumed father. The latter finding was based on abandonment (not promptly coming forward to demonstrate a full commitment to parental responsibilities). The finding negated Eric's ability to veto the adoption by withholding his consent and allowed his parental rights to be terminated so long as termination was in Zachary's best interests. The trial court entered an order terminating Eric's parental rights on December 1; it entered a judgment on biological and presumed status on December 8.

On appeal, we found that the trial court had ruled against Eric on the basis of delay and a failure to take a personal interest in Zachary. As to delay, we pinpointed that the trial court had relied upon Eric's self-representation and

---

[1]For convenience we refer to the parties by their given names.

failure to promptly make an unequivocal request for custody and visitation. We concluded that self-representation may not be used as evidence of a lack of commitment to parenthood. We also added that opposing counsel's management of the termination proceedings prejudiced Eric's claim of promptness.[2] We then analyzed the case as follows.

"The ultimate issue is the sufficiency of the evidence supporting the trial court's conclusion that [Eric] failed to come forward to demonstrate his willingness to assume his parental responsibilities. In the instant case, after redacting the evidence the use of which we have determined to be limited by law, irrelevant, or inequitable, what remains established is that from the time [Eric] learned of the pregnancy, his motivating principle was to succor [the mother] and [Zachary]. He bought her clothes, repaired her car, and sent her money. He discussed with her health insurance, schools, names, and his role in the baby's life. When she cut off communication with him, he attempted to restore it. When she disappeared, he looked for her. Toward this end, he sought free legal advice from Father's Legal Counsel; he hired investigators to find her; he contacted every adoption attorney in the Santa Cruz telephone book; he called hospitals and social service agencies; and when he did find her, he hired a paralegal and before the birth of the baby filed a petition to establish a parental relationship. He then wrote a letter to [the mother] 'beg[ging]' her to reconsider adoption and announcing 'an option that [she] apparently ha[d] not considered seriously,' namely, that he was 'prepared to accept the enormous responsibilities of fatherhood and [was] ready to meet them head on.' He then filed a motion for a blood test, appeared at the first hearing on his petition to establish a parental relationship, and informally requested visitation with [Zachary].

"On the other hand, [Eric] failed to appear for the January 30 hearing. He acted shortly thereafter, on February 1 or 2, to set up an appointment for a blood test on March 2, but his blood sample was not given until March 23. Between January 30 and March 23, he made no effort to inquire about the status of his case or have the matter set on calendar for the reception of the blood test results. He waited even longer to arrange for blood tests for [the mother] and [Zachary].

"When [Eric] learned of the dismissal, it took him another month to file a change of address with the court. Thereafter, he received copies of orders obtained by [opposing counsel], retained counsel and took active measures to reinstate his case.

---

[2]In addition to opposing counsel's failure to give Eric notices, we noted instances where opposing counsel contributed to delay by resisting routine motions and stipulations on the basis that delay was in his clients' interests.

"The trial court concluded that [Eric] did not request custody or visitation as early as possible; that he did not request custody, visits, and photographs when [Zachary] was born or inquire as to the child's condition, sex or name until [Zachary] was well over a year old; and that there was a 'lack of effort to give blood in a timely manner . . . .'

"[Eric's] delay in asking for custody and visitation orders is not necessarily fatal to his cause. This is not a case like [Adoption of] Michael H. [(1995) 10 Cal.4th 1043 [43 Cal.Rptr.2d 445, 898 P.2d 891]] where the mother revealed her intent to place the child for adoption early in the pregnancy and the father concealed his desire for custody until two weeks after the birth of the baby and pretended to the mother and the prospective adoptive parents that he consented to the adoption. It was clear from the time of [the mother's] announcement of the pregnancy that [Eric] expected to be involved with the upbringing of the child.

"[Eric] assumed he would be responsible for support and started contributing to [the mother's] expenses. He discussed his involvement with the child with [the mother]. [The mother] 'shocked' him by intimating that his role would be limited to financial support, but she also told him he could relocate to Santa Cruz where she planned to bring up the child.

"It was not until [Eric] heard rumors that [the mother] was planning to place the child for adoption that the issue of custody arose. [The mother] gave [Eric] no inkling that she intended to give up the child and, in fact, she could not have so informed him while she remained communicado because she did not make that decision until after she went into hiding. Consequently, unless [Eric's] conduct led [the mother] and the prospective adoptive parents to believe that he consented to adoption, the mere fact that he did not formally request custody and visitation orders when he initiated legal action before the baby's birth does not mean that he was not ' "willing[] himself to assume full custody of the child . . . ." [Citation.]' (Adoption of Kelsey S. [(1992)] 1 Cal.4th [816,] 849 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)

"When [Eric] learned that [the mother] was considering adoption, he immediately undertook a 'laudatory' search for her. He initiated legal action before the baby was born. Shortly after the birth, by letter, [Eric] offered [the mother] the 'option' he thought she had not 'considered seriously,' namely, that he was 'prepared to accept the enormous responsibilities of fatherhood . . . .' [Eric] also informally requested visitation after the first court hearing. Both [the mother] and [her counsel] refused, although [counsel] offered to accede to visitation if [Eric] relinquished his parental rights. Both [the mother] and [her counsel] were candid in admitting hostility to [Eric's] claim to [Zachary].

"*Kelsey S.* requires an unwed father to 'assume his parental responsibilities as fully as the mother will allow and his circumstances permit.' (1 Cal.4th at p. 849.) Since [the mother] made it clear there was nothing she would allow, attempts by [Eric] to informally obtain custody or visitation, or even to request information and photographs clearly would be futile. Since '[t]he law neither does nor requires idle acts' (Civ. Code § 3532), these omissions are insufficient by themselves to prove that [Eric] was not fully committed to parenthood.

"Once [Eric] was represented by counsel, he made a formal request for temporary custody. This request was not a surprise for [Robin and Joanne]. They knew before the birth that an interested father existed and that he was seeking to stop the adoption. [Eric] made no secret of his intention to stop the adoption and gain custody of [Zachary] during the pendency of the paternity action. It would have been wiser for [Eric] to have checked the box on the petition when he first filed it, but he did not.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"The issue here is whether [Eric's] lapses once he became involved in court proceedings cancel the effect of his responsible conduct from the time he learned of the pregnancy. The trial court held that they did. The trial court, however, clearly relied heavily on [Eric's] exercise of his right of self-representation to defeat his claim. This error, and the probable use of evidence of delay which we have determined must be excluded, make remand to the trial court for reconsideration 'prudent.' (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 850.)

"On remand, as *Kelsey S.* instructed, 'the trial court must take into account petitioner's conduct throughout the period since he learned he was the biological father, including his conduct during the pendency of this legal proceeding, both in the trial and appellate courts, up to the determination in the trial court on remand by this court. We recognize that during these proceedings petitioner may have been restricted, both legally and as a practical matter, in his ability to act fully as a father. Nevertheless, the trial court must consider whether petitioner has done all that he could reasonably do *under the circumstances*.

" 'If the trial court finds on remand that petitioner failed to demonstrate the required commitment to his parental responsibilities, that will be the end of the matter. . . . [I]f (*but only if*) the trial court finds petitioner demonstrated the necessary commitment to his parental responsibilities, there will arise the further question of whether he can be deprived of the right to

withhold his consent to the adoption' (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 850) because of unfitness under Family Code section 7823 et seq." (*Adoption of Zachary H.*, *supra*, H014891.)

On remand, Eric filed a motion for custody of Zachary and, alternatively, for visitation. Zachary's mother opposed the motion and supported the current custody; she also noted that Eric had been allowed visitation whenever he had requested but it had been over one year since the last visit. The trial court heard additional testimony by Eric and Joanne on March 11, 1997. On March 19, it reinstated Eric's parental rights. It commented: "And the fact that he has his parental rights back intact doesn't mean that we don't have some heavy duty decision making to make, and he has it too, but he is entitled to participate in that decision-making process." It then continued the matter to March 26 "for issues of custody, visitation and what's to occur next." Two days before the hearing, Robin and Joanne filed a guardianship petition. At the hearing, Robin and Joanne requested appointment of counsel for Zachary. The trial court granted the request, continued the hearing to April 9, and ordered visitation to continue "as is currently occurring" (Joanne had indicated that Eric had visited in February and that she and Robin had always let Eric visit). At the hearing, Eric, Zachary, and the department of social services appeared via counsel; Robin and Joanne appeared without counsel (they substituted new counsel after the hearing). After the hearing, the trial court ordered that (1) Robin and Joanne and Eric participate in mediation; (2) Eric have visitation every other week; and (3) the department of social services report upon Eric's fitness, whether a grant of custody to Eric would be detrimental to Zachary, and whether granting custody to Robin and Joanne would be in the best interests of Zachary. It continued the hearing to June 10. In May, Zachary's mother filed a pleading seeking physical custody in the event that the trial court contemplated placing custody with persons other than Robin and Joanne.

The trial court heard the matter on June 3, 1997, shortly before Zachary's third birthday. All parties agreed that the pivotal issue was custody as raised by Eric in his family law paternity case motion, Robin and Joanne in their probate law guardianship petition, and the mother in her generalized pleading. And, though Eric had not formally signed a refusal to the adoption, they implicitly accepted that the adoption had failed due to Eric's opposition. Moreover, they agreed on the facts. Eric's counsel stated: "In terms of the facts, I think they're pretty straightforward. In terms of the legal standard, I think that's tough. We are prepared to stipulate to the facts." He added: "I could have written the Social Services report two months ago. The child is going to suffer detriment if removed from [Robin and Joanne]. The child may or may not suffer detriment if placed with [Eric]. [Eric] is a fit parent.

And [Robin and Joanne] are nice people. But those are all givens, I think, in the report. [¶] And we can go through the whole drill and all the testimony, and we're going to come out in the same place."

The testimony confirmed counsel's remarks.

Social Worker Diane Bechtle opined that Zachary was attached to Robin and Joanne (and to his "brother," the couple's son); she continued that Zachary would experience permanent devastation and trauma if he were removed from their custody. The trial court was constrained to comment on Bechtle's testimony: "[T]he only set of parents that this child has, looking at it from the eyes of the child, are [Robin and Joanne]. That's going to be the trauma. [¶] . . . I'm really stating the obvious. I've got a father, a biological father, who I've said still has rights. And I've got [Robin and Joanne] who have raised a child from birth. [¶] And the reality is that I've got a most unfortunate situation."

Psychologist Frederica Conrad opined that Robin and Joanne were Zachary's psychological parents; she added that Zachary was attached and bonded to them; and she expressed in many different ways that Zachary would suffer short- and long-term adverse effects if he were removed from their custody.

Eric testified that he believed that there would be harm to Zachary if he won custody but that the harm would be less than what people believed. He conceded that "Zachary's best interest is—obviously at this point Zachary is in his best interest at Robin and Joanne's."

Zachary's mother testified that she supported custody in Robin and Joanne and was seeking custody so as to prevent Zachary from being broken off from Robin and Joanne. She added that she had made preparations to move from Newport Beach to Santa Cruz if the trial court awarded her custody.

Joanne testified that she had cared for Zachary since birth, was willing to be a guardian if the adoption failed, and was willing to allow contact between the birth parents and Zachary under either guardianship or adoptive circumstances. She added that she and Robin had been married for 10 years, they have a child, Nicholas, she is a full-time caretaker of the children, and Zachary calls her "mommy" and Robin "daddy."

During argument, Eric's counsel conceded that there was evidence for the trial court to find that custody in Robin and Joanne was in Zachary's best interests. Counsel added: "I think the Court can find that there is, even by

clear and convincing evidence, detriment to the child to be removed from [Robin and Joanne]." He then maintained his argument that custody in Eric was mandated because there was no evidence that Eric was unfit.

In granting the guardianship petition, the trial court explained as follows. "As I indicated earlier, the considerations before me are the 3040 of the Family Law provision and 3041 with respect to the standard. I've already discussed with [Eric's counsel] that I do not believe that the similar [*sic*] fact of a biological parent's fitness is the determining factor in detriment. [¶] And I'm well aware of the fact that I should so state for the record that [Robin and Joanne] today did not approach the case as one singularly of fitness at all. So there obviously would not otherwise, in any event, necessarily be any evidence to show up fitness, although this court is of the view that Eric is a fit parent. [¶] It's also my view factually from the record, both at this hearing today as well as a prior hearing, my understanding of what took place with respect to the unfortunate situation that we're now presented with, that Eric was not at fault and neither were [Robin and Joanne].

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"There is no dispute in the evidence as presented to me today whatsoever—everybody has testified, interestingly, to the same thing if you think of the testimony. Is it in the child's best interest to stay with [Robin and Joanne]? Did anybody say it was not? The answer is nobody said that it was not. [¶] Will there be harm to the child? Everybody acknowledges that there will be harm to the child. Does that harm rise to the level of a detriment to the child? I have two experts, particularly the doctor who described more than likely life-long permanent damage to the child, given the child's age and the child's needs at this particular age, if the child was removed from [Robin and Joanne].

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"This child is in a normal and positive and nurturing environment that has developed a strong bonded relationship with [Robin and Joanne], and he's at a particular age where he's so vulnerable to damage by removal of that relationship that I absolutely find—and of course clear and convincingly—it's more than that with respect to detriment. [¶] There is no dispute, if you think about the facts. We dispute the law is what we're disputing, if [Eric's counsel] is right on the law, that [*sic*] I've made a wrong decision. [Robin's and Joanne's counsel] is right on the law, I've made a right decision beyond clear and convincing. We know what that's saying. [¶] So I find that there would be detriment based on my understanding of detriment, and clearly it

would be in the best interests of this child to remain with [Robin and Joanne], which also means a guardianship. . . . [¶] I also believe, by the way, that it's in this child's best interests to have a relationship with the biological father, and ongoing. And I have a unique situation. And of course, as you all know, I'm very sensitive to not ruining the potential for a good positive extended family here, like I don't like to hear negatives about Eric, and I don't like to hear negatives about [Robin and Joanne]."

APPEALABILITY

At the threshold, Robin and Joanne contest this appeal procedurally.

Robin and Joanne concede that a guardianship order is appealable. (See Prob. Code, § 1301, subd. (a).) But they argue that the judgment in this case was not final. They urge that the trial court "predicted that by appointing [Robin and Joanne] as Zachary's guardians, 'I'm encouraging a continuing battle to fight over who's going to be the parents' [citations] and in fact several post-trial hearings have already been conducted on the issue of visitation."

There is no merit to this contention. The trial court's "prediction" of what might occur after judgment, by definition, does not affect the finality of the judgment. It simply anticipates that there might be postjudgment contests that result in postjudgment orders.

Robin and Joanne alternatively claim that the appeal is untimely because it was filed more than 60 days after it was "rendered" in court. They note that the trial court announced its decision in open court on June 3, 1997, and Eric filed his notice of appeal on October 3.

Again, the analysis is erroneous. A notice of appeal must ordinarily be filed 60 days after the date of service of a notice of entry of judgment (or of a file-stamped copy of the judgment) or 180 days after entry of the judgment. (Cal. Rules of Court, rule 2(a).) And entry of an appealable judgment is normally the date of filing. (Cal. Rules of Court, rule 2(b).) Here, the trial court signed and filed two documents constituting the judgment: an order after hearing granting the guardianship petition and appointing Robin and Joanne guardians in a form drafted and approved by counsel; and an order appointing Robin and Joanne guardians on the Judicial Council form. Both orders were filed on August 4, 1997. Though there is nothing in the record to indicate that Eric was served a notice of entry or a file-stamped copy of the orders, his notice of appeal was filed 59 days after the orders were filed, making the appeal timely under any circumstance.

## DISCUSSION

A court may appoint a guardian of the person of a minor upon hearing a guardianship petition "if it appears necessary or convenient." (Prob. Code, § 1514, subd. (a).) In appointing a guardian of the person, the court is governed by chapter 1 (commencing with § 3020) and chapter 2 (commencing with § 3040) of part 2 of division 8 of the Family Code, relating to custody of a minor. (Prob. Code, § 1514, subd. (b).)

Family Code section 3040 provides in part: "(a) Custody should be granted in the following order of preference according to the best interest of the child as provided in Sections 3011 and 3020: [¶] (1) To both parents jointly . . . or to either parent. . . . [¶] (2) If to neither parent, to the person or persons in whose home the child has been living in a wholesome and stable environment."

Family Code section 3041 states in part: "Before making an order granting custody to a person or persons other than a parent, without the consent of the parents, the court shall make a finding that granting custody to a parent would be detrimental to the child and that granting custody to the nonparent is required to serve the best interest of the child. . . ."

When the court appoints a nonparent as the guardian of the person of a child, the authority of the parent ceases. (Fam. Code, § 7505.) It is the guardian, not the parent, who has the care, custody, and control of the child. (Prob. Code, §§ 2350, 2351.) However, "[a] guardian or conservator is subject to the regulation and control of the court in the performance of the duties of the office." (Prob. Code, § 2102.) ■ The court has the continuing power to grant visitation rights in a probate guardianship proceeding. (*Guardianship of Martha M.* (1988) 204 Cal.App.3d 909, 911, 913 [251 Cal.Rptr. 567].)

Once a permanent guardianship of a child is established, it continues until terminated. A guardianship of the person terminates when the ward attains majority, dies, is adopted, or becomes emancipated. (Prob. Code, § 1600.) In addition, upon petition of the guardian, a parent, or the ward, the court may make an order terminating a guardianship if the court determines the guardianship is no longer necessary or termination is in the ward's best interest. (Prob. Code, § 1601.)

■ Eric contends that the federal Constitution embodies a parental preference doctrine that requires a showing of parental unfitness before a nonparent may be appointed as guardian of a child.

Eric relies upon *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (if an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent); *Cynthia D.* v. *Superior Court* (1993) 5 Cal.4th 242, 251 [19 Cal.Rptr.2d 698, 851 P.2d 1307] (until the state has established parental unfitness it cannot assume that the interests of the child and his or her parents diverge, and until such time parent and child share an interest in preventing an erroneous termination of the relationship); and *In re Jasmon O.* (1994) 8 Cal.4th 398, 423 [33 Cal.Rptr.2d 85, 878 P.2d 1297] (a finding of unfitness is necessary as a matter of due process before parental rights may be terminated).

Eric's reliance is patently erroneous. The passages credited by Eric and recounted above make clear that the cited cases stand for the proposition that federal due process principles safeguard termination of parental rights in the absence of a showing of unfitness. This case does not involve termination of parental rights. It simply involves custody after a failed adoption.

We add that *Kelsey S.* suggests in dictum that where a parent, having the right to do so, vetoes an anticipated adoption, the question of whether custody of the child should be awarded to the parent is a matter for separate determination. (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 851 ["If, however, the trial court concludes that petitioner has a right to withhold consent, that decision will bear only on the question of whether the adoption will proceed. Even if petitioner has a right to withhold his consent (and chooses to prevent the adoption), there will remain the question of the child's custody."].)

Eric secondarily claims that the parental preference doctrine is mandated by statute.

Eric relies on Family Code section 8804, subdivision (c). This statute states: "If a birth parent who did not place a child for adoption . . . has refused to give the required consent . . . the court shall order the child restored to the care and custody of the birth parent or parents."

Case authority has held that the mandate of this statute is unequivocal: the child must be returned and there is simply no discretion to consider whether the child has bonded to the prospective adoptive family or who will provide a better home. (*In re Timothy W.* (1990) 223 Cal.App.3d 437, 445-446 [272 Cal.Rptr. 906].) "When consent is refused, the law does not permit a court to

examine the best interests of the child in making a custody determination. Issues of bonding and lifestyles of the birth parents and their families are totally irrelevant in a proceeding which is to be limited only to effectuating the unconditional return of the child to his or her birth mother. Thus, retention of the child after a birth parent has refused to consent to an adoption only worsens an already tragic situation: The child remains longer in the adopting parents' home, only increasing the pain when he or she is inevitably removed per the mandate of [Family Code section 8804, subdivision (c)]." (*Id.* at p. 448.)

Eric argues that the trial court ignored the statute: "Only if Family Code § 8804(c) were determined for some reason to be unconstitutional—a position taken by no party in this case—could such judicial activism be acceptable. Here, it was error to ignore the statute."

Eric overlooks that Robin and Joanne attacked the constitutionality of Family Code section 8804, subdivision (c), in their trial brief. And, in his appellate brief, he fails to address in this context the case of *In re Bridget R.* (1996) 41 Cal.App.4th 1483 [49 Cal.Rptr.2d 507], the principal authority that Robin and Joanne relied upon for their constitutional challenge. In addition, he fails to cite any authority contrary to *Bridget R.*

We agree with Robin and Joanne that the reasoning of *Bridget R.* is applicable to this case.

In *Bridget R.*, the natural parents voluntarily relinquished their twin daughters at birth to an agency for adoption, the father concealing his American Indian ancestry in order to expedite the adoption. About a year later, the father disclosed his Indian heritage for the first time and invoked provisions of the federal Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) in an effort to invalidate the relinquishment and place the children within his extended family. The trial court invalidated the relinquishment and ordered the children returned to the father's extended family. The appellate court reversed. It found in these circumstances that the children's right to a stable and permanent home had assumed constitutional dimensions, and therefore concluded, under principles of substantive due process, equal protection, and federalism, that the ICWA can properly apply only where it is necessary and actually effective to accomplish its stated, and plainly compelling, purpose of preserving Indian culture through the preservation of Indian families. The court remanded for determination of factual issues that would control the decision whether the ICWA applied to the case and, if it did and the natural parents' rights were not validly terminated under the ICWA, for a custody determination in which the adoptive parents

would have the burden of proving detriment to the children would result from a change of custody. This custody hearing was to be conducted within the context of the pending petition for guardianship that the adoptive parents had filed in anticipation that application of the ICWA might preclude the adoption.

The court prefaced its opinion with the following statement: "California recognizes the principle that children are not merely chattels belonging to their parents, but rather have fundamental interests of their own. [Citation.] Such fundamental interests are of constitutional dimension." (*In re Bridget R., supra,* 41 Cal.App.4th at p. 1490.)

The court later described that concerns with a child's emotional attachment to the family he or she has known since birth and with security and stability in a child's life have prompted courts to consider the child's interests paramount to the birth parents: "[A]s a matter of simple common sense, the rights of children in their family relationships are at least as fundamental and compelling as those of their parents. If anything, children's familial rights are more compelling than adults', because children's interests in family relationships comprise more than the emotional and social interests which adults have in family life; children's interests also include the elementary and wholly practical needs of the small and helpless to be protected from harm and to have stable and permanent homes in which each child's mind and character can grow, unhampered by uncertainty and fear of what the next day or week or court appearance may bring. [Citation.] [¶] Cases which hold that deference is to be accorded to *parental* rights do so in part on the assumption that children's needs generally are best met by helping parents achieve their interests. [Citations.] In some situations, however, children's and parents' rights conflict, and in these situations, the legal system traditionally protects the child." (*In re Bridget R., supra,* 41 Cal.App.4th at p. 1504.)

The court also observed: "[P]rior judicial decisions establish that, where a child has formed familial bonds with a de facto family with whom the child was placed owing to a biological parent's unfitness [citation] or initial failure to establish a parent-child relationship [citations], and where it is shown that the child would be harmed by any severance of those bonds, the child's constitutionally protected interests outweigh those of the biological parents. [Citations.] The rule can logically be no different where children have become bonded to a family in which they were placed after a knowing, intelligent and express relinquishment of parental rights. Inasmuch as children have a liberty interest in the continuity and stability of their homes [citations], where a child's biological parents knowingly and intelligently

relinquish the child to others for the express purpose of giving the child a loving and stable home, the biological parents' voluntary act constitutes at the very least a voluntary *subordination* of their constitutional rights to those of the children. The biological parents thus must rely solely upon ICWA for any claim which they might have in this matter." (*In re Bridget R., supra*, 41 Cal.App.4th at p. 1506.)

We acknowledge that this case is distinguishable from *Bridget R.* in the sense that Eric has never voluntarily relinquished Zachary and thereby subordinated his constitutional rights to those of Zachary. But the point is of no moment since there nevertheless exist competing constitutional rights and the legal system traditionally protects the child's rights first.

Family Code section 8804, subdivision (c), must therefore be construed as being subject to constitutional rights. (Cf. *In re Bridget R., supra*, 41 Cal.App.4th at p. 1504 [ICWA § 1913(c) mandating return of the child to the parent where the parent's consent to adoption is validly withdrawn cannot override child's constitutional interest in a stable and permanent placement].)

In summary, Zachary has had stable placement with Robin and Joanne since his birth more than four years ago. His constitutional right to such placement cannot be superseded by the mandatory return feature of Family Code section 8804, subdivision (c).

Eric next contends that there is no evidence that placement of Zachary with him would be detrimental. He relies upon the provision of Family Code section 3041 mandating that ". . . the court shall make a finding that granting custody to a parent would be detrimental to the child and that granting custody to the nonparent is required to serve the best interest of the child. . . ." He claims that the statute requires a two-pronged finding: (1) detriment if the parent is given custody; and (2) best interest to give the nonparent custody. He reasons that the two criteria must be distinct or else they would be redundant. He continues that, since the best interest prong encompasses nonparent custody, the detriment prong cannot be satisfied by a showing that removal from a nonparent will be detrimental; rather, it must be shown that placement with the parent will be detrimental because of something flowing from parental custody. Since the trial court found Eric a fit parent, Eric reasons that the evidence does not support the guardianship order. We disagree.

Eric's argument is merely another version of his claim that parental unfitness must be proven in this case. As before, Eric has no authority for the

claim. He cites *In re B. G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244], but concedes that the case interpreted recent statutory changes to eliminate fitness as the focus of a parental custodial right. He does pinpoint where the case quotes from a report of the Assembly Judiciary Committee. The report gave reasons for the detriment prong in Civil Code former section 4600 (Fam. Code, § 3041 is a reenactment without substantive change of Civ. Code, § 4600). The quote states, in part: " 'What is "detrimental" has not been set forth with particularity. It is a nearly impossible task to devise detailed standards which will leave the courts sufficient flexibility to make the proper judgment in all circumstances . . . [.] *The important point is that the intent of the Legislature is that the court consider parental custody to be highly preferable. Parental custody must be clearly detrimental to the child before custody can be awarded to a nonparent.*' [Citation.]" (11 Cal.3d at p. 698, italics added by the court.) The court then adds: "In summary, the parental preference doctrine, as it existed before the enactment of the Family Law Act, embodied both a requirement that a custody order in favor of a nonparent rest upon a finding of parental unfitness, and the limitation that such an order would be made only in extreme cases. The enactment of [Civil Code] section 4600 changes the former principle, and focuses attention not on the unfitness of the parent but the detriment to the child. [Citation.] The Legislature did not, however, intend to disturb the judicial practice of awarding custody to nonparents in preference to parents only in unusual and extreme cases." (*Ibid.*) The court then concluded that the statute "permits . . . [an] award [of] custody to a nonparent against the claim of a parent only upon a clear showing that such award is essential to avert harm to the child." (*Id.* at pp. 698-699.)

We do not glean from *In re B. G.* support for Eric's position so much as we glean that detriment has no clear-cut meaning and the courts must have flexibility to make fact-specific decisions in cases like this one. More importantly, however, is that later Supreme Court authority acknowledges that the harm from being removed from a stable placement can support the detriment prong of Family Code section 3041.

In *Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787 [218 Cal.Rptr. 39, 705 P.2d 362], a 12-year-old mother relinquished her son for adoption at birth. The 16-year-old father refused to consent to the adoption. The prospective adoptive parents and the mother filed a petition to terminate the father's parental rights. The father countered with a paternity petition and motion for temporary custody and visitation. The trial court awarded temporary custody to the father. The Supreme Court reversed. It held that no substantial evidence supported the implied finding of no detriment if custody was awarded to the father. Though the holding was partly predicated upon the

father's undisputed immaturity, it was also based on the undisputed harm that the child would suffer if he was removed from a bonded relationship. The court stated: "The record, however, contains uncontroverted evidence which indicates that [the father] lacked the maturity needed to care for a child and that to award custody of [the child] to [the father], after he has established a bond with the [prospective adoptive parents], would be detrimental." (*Id.* at p. 793, fn. omitted.) The court later explained: "We do not imply that [the father] is 'unfit' in the sense that, if he received custody of [the child], the state would have grounds to intervene and remove the child. . . . It is presumably detrimental to a child to award custody to a parent who is so unfit that the state might have to intervene to retrieve custody, but it might also be detrimental to place him with a parent who is not unfit, depending upon the child's current circumstances and the available placement alternatives." (*Id.* at p. 796, fn. 8; see *id.* at pp. 800-801 (dis. opn. of Reynoso, J.) [accusing the majority of departing from precedent in considering the effect of severing emotional bonds as part of the detriment prong and arguing that the appropriate inquiry is whether awarding custody of a child to his natural father would be detrimental, in and of itself, without considering whether the child's removal from prospective adoptive parents would independently be detrimental].)

The point was also acknowledged by the court in the case of *In re Bridget R.*, *supra*, 41 Cal.App.4th at page 1520, in its analysis of the case posture on remand: "California's guardianship law offers equitable and constitutionally permissible standards for resolving the question of the proper custody of the twins in the event their pending adoption by the R's fails due to the application of ICWA. These standards look to something more than the twins' 'best interests,' but rather require an examination of whether a custody change will result in detriment to them. These standards are consistent with the statutory preferences for maintaining a child's custodial ties with the biological parents, but do not require that result if the evidence shows that the child would be harmed if removed from the custody of those persons who have acted as de facto and psychological parents since birth and with whom the child has bonded." The court added: "We find ourselves entirely in agreement with the comments of counsel for amicus curiae American Academy of Adoption Attorneys that expressed the view that 'a custody hearing is required to determine the placement of a child *whenever* an adoption is dismissed or denied, whatever the applicable law. When a child's interests and needs are affected detrimentally by a proposed remedy for a wrong inflicted upon a parent or de facto parent, the law must craft a solution that protects the child. Whether denominated an equitable or constitutional remedy, or a statutory solution, as, for example, the guardianship proceedings available under California . . . law, it is essential that the Court

not automatically "return" children to individuals who are socially and psychologically strangers to them. This is not an argument for ignoring the rights and interests of any of the adult parties affected by a failed adoption. In cases like this one, a custody hearing will evaluate the effect on all parties, and especially the twins, of having been placed in what was reasonably understood to be a secure, permanent placement, a placement whose future may now depend on whether the twins will be classified retroactively as Indian children for the purposes of ICWA.' " (*Id.* at p. 1520, fn. 23.)

Eric next contends that guardianship has inappropriate standards to be a legitimate stand-alone remedy (court may appoint if "necessary and convenient"). He states: "As a remedy for situations too diverse to attempt to catalogue, guardianships serve a useful purpose. But as a mechanism for the removal or continued deprivation of a parent child relationship, it is constitutionally and substantively woefully inadequate." We disagree.

Again, Eric offers no authority for his position. He cites language from *Guardianship of Stephen G.* (1995) 40 Cal.App.4th 1418, 1429 [47 Cal.Rptr.2d 409] ("Apart from the requirements of Family Code section 3041, the only precondition for granting a guardianship petition is that it 'appears necessary and convenient.' [Citation.] These substantive standards more closely resemble the ambiguous requirements of the statutes held insufficiently protective [by the United States Supreme Court]."). But the issue in *Stephen G.* was whether the standard of proof in guardianship proceedings was clear and convincing evidence or preponderance of the evidence, not whether guardianship proceedings were appropriate in failed adoptions. Eric also fails to address *In re Bridget R., supra,* 41 Cal.App.4th 1483, which concluded that "guardianship law offers equitable and constitutionally permissible standards for resolving the question of the proper custody [after a failed adoption]." (*Id.* at p. 1520.) Moreover, Eric overlooks that the guardianship in this case did not deprive him of his parent-child relationship. The trial court had ordered visitation and made clear that it was in Zachary's best interests to have an ongoing relationship with Eric.

Eric finally argues that there is no moral or legal foundation for keeping Zachary from him. He concedes that a child has the constitutional right to stable placement. But he argues that the state does not interfere unless the rights of the child and parent diverge. He claims that the rights do not diverge unless some fault can be attributed to the parent. We disagree with Eric's logic.

Zachary has been in a stable placement for over four years. He has bonded with Robin and Joanne and will suffer trauma if removed from their custody.

Eric wants to remove Zachary from their custody. Though Eric is without fault for the circumstances, the constitutional rights of Eric and Zachary could not be more divergent.

## DISPOSITION

The order, comprised of the order after hearing and order appointing guardian, is affirmed.

Cottle, P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 22, 1999. Kennard, J., was of the opinion that the petition should be granted.