Filed 6/19/13  In re R.S. CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.S., a Person Coming Under the Juvenile Court Law. | |
| MERCED COUNTY DEPARTMENT OF HUMAN SERVICES, | F066003 |
| Plaintiff and Respondent, | (Super. Ct. No. JP000618) |
| v. | **OPINION** |
| RACHAEL W., | |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from an order of the Superior Court of Merced County.  John D. Kirihara, Judge.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*] Before Gomes, Acting P.J., Franson, J. and Peña, J.

James N. Fincher, County Counsel, and Shari L. Damon, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Rachael W. (mother) appeals from the juvenile court's disposition on a Welfare and Institutions Code section 300 petition,[1] which placed R. with her noncustodial father, Hector S. (father), in Mexico, gave mother visitation rights as arranged by the parties, and terminated dependency jurisdiction. Mother contends the juvenile court erred when it placed R. with father and terminated dependency jurisdiction, and any failure of her trial counsel to preserve either issue for appellate review constitutes ineffective assistance of counsel. We affirm.

## BACKGROUND

In July 2012, nineteen-month-old R. was placed in protective custody when mother was arrested for child endangerment. A social worker and police found R. with mother at an apartment where two women had been arrested for possession of heroin and methamphetamine. R. was lying unresponsive on a dirty mattress on the floor; she had ingested a pill she found on the floor. Mother admitted dropping the pill on the floor and that R. had picked it up; mother tried to take the pill out of R.'s mouth, but she already had chewed half of it. Mother waited 15 hours before calling poison control. R. was transported to the hospital, where she tested positive for benzodiazepines. A social worker spoke with father, who had been deported to Mexico on December 29, 2011, after being arrested for drug related charges on October 26, 2011. He told the social worker mother had given R. medication to help her sleep in the past and he wanted R. to be tested to see how long the psychotropic medications had been in R.'s body. Mother had been receiving voluntary family maintenance services since October 26, 2011.

_____

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

Components of the service plan included drug testing, parenting, and mental health services. R.'s maternal grandmother, Barbara W., told the social worker that mother is a habitual liar and drug abuser, with serious mental health issues. Barbara, who has legal guardianship of mother's 11-year-old daughter Madison, said mother should not be allowed to get R. back. Mother also has a son, whose father is David O., who was the subject of dependency proceedings that began in 2007. Mother's parental rights were terminated when she failed to reunify with her son, and his adoption was finalized in June 2010.

Respondent Merced County Department of Human Services (Department) alleged these facts in its petition as a basis for dependency jurisdiction (§ 300, subd. (a) (serious physical harm), and (b) (neglect)). It also alleged that R. had been left without provision for support as father resided in Nuevo Vallarta, Nayarit Mexico, and had failed to pay child support since he was arrested and deported (§ 300, subd. (g) [no provision for support]). R. was detained from mother and placed into foster care with the family who adopted mother's son.

R. was born in November 2010. At that time, mother was in a program, which she entered after getting out of jail. She had completed parenting classes, a drug treatment program, and was testing clean until she exited the program on September 11, 2011. Thereafter, mother stayed at Barbara's house until about April 2012. Barbara confirmed that while at her house, mother was not using drugs and was taking her medication. When mother left Barbara's house, she moved in with her boyfriend, Carlos C. After that, Barbara did not know what mother was doing because she did not see much of her. Mother would drop R. off with Barbara so she could go to college and her mental health appointments. When mother moved in with Carlos, Barbara told mother she was no longer allowed in her house.

Once father's paternity was confirmed and a child support order issued on February 14, 2011, father helped care for R. and maintained daily contact with her.

3.

Mother would drop R. off with father and his wife, Andrea R., at father's house at 7 a.m. so mother could go to school, and picked her up after school at around 4 p.m. When a social worker asked mother, after R. was detained, about having R. placed with father, she responded, "No because as long as I'm able to take care of her, I'm going to. Maybe for her to visit him and his wife." A social worker asked father why he thought R. was in foster care. Father responded, "Because unfortunately when [mother] doesn't take her medication, she's a different person. She doesn't take care of herself or others. Maybe she started using drugs again. But before I was deported, [mother] was doing well and she was a really good mom. She always had R[] clean and well dressed."

Father, who speaks only Spanish, was born and raised in Jalisco, Mexico. He graduated high school and completed half of an engineering program in Mexico; he was unable to complete his college education due to financial issues with his family. Father and his immediate family came to the United States to be close to his sick mother, who had since passed away.

Father has the following criminal history: (1) February 2006 – misdemeanor convictions for hit and run with property damage (Veh. Code, § 20002, subd. (a)(1)), driving on a suspended/revoked license (Veh. Code, § 14601.1, subd. (a)), violation of promise to pay fine (Veh. Code, § 20509.5, subd. (b)), and rearrest/revocation of probation (Pen. Code, § 1203.2, subd. (a)); (2) June 2007 – an arrest for driving while his license was suspended (Veh. Code, § 14601.1, subd. (a)); (3) October 2007 – misdemeanor conviction for cruelty to a child, with possible injury/death (Pen. Code, § 273a, subd. (a)) and possession of controlled substance paraphernalia (Health & Saf. Code, § 11364, subd. (a)) – father was placed on 36 months of probation and ordered to pay fine; and (4) October 25, 2011 – felony convictions for maintaining a place/trafficking of a controlled substance (Health & Saf. Code, § 11366), causing or permitting cruelty to a child (Pen. Code, § 273a, subd. (b)), and rearrest/revoke probation (Pen. Code, § 1203.2, subd. (a)).

4.

In June 2007, dependency proceedings were initiated over five children father has with his wife, Andrea: S., Alexis, M., Johan and Joshua. The juvenile court found the children came within the provisions of section 300, subdivision (b), declared them dependents, and ordered reunification services for father and Andrea. At the six month review hearing in February 2008, the children were returned to their parents and dependency jurisdiction terminated.

Father has a daughter, Sh., with another woman, Crystal O. On October 28, 2011, dependency proceedings were initiated over Sh. and three of father's five children that were the subject of the 2007 dependency, M., Johan and Joshua S. (the 2011 dependency case). In December 2011, the juvenile court (1) declared M., Johan and Joshua dependents pursuant to section 300, subdivisions (b) and (g), and ordered reunification services for father and Andrea, and (2) declared Sh. a dependent pursuant to section 300, subdivision (b), denied reunification services for Crystal pursuant to section 361.5, subdivision (b)(1), and ordered reunification services for father. At the July 26, 2012, six month review hearing in both cases, the court ordered six more months of reunification services for father and Andrea. A 12-month status review hearing was set for January 24, 2013.

Father told a social worker that he and Andrea had completed all the requested services in the 2011 dependency case, and they were hoping the children could come live with them in Mexico. He and Andrea had been working with the Mexican social services agency, Desarrollo Integral de la Familia (DIF), and completed their parenting classes, as well as drug testing. DIF had completed a home study, a psychological assessment and medical clearance on father and Andrea. Father admitted that he was arrested for drug sales and child endangerment, which resulted in placement of the children in foster care for about nine months, but he completed drug treatment and parenting classes, and the family successfully reunified.

5.

The social worker in the 2011 dependency case confirmed that father had completed his parenting classes in Mexico, and reported he had been able to use the skills learned in the class to help parent his adolescent son who was returned to Mexico by Merced County Juvenile Probation. Father had also submitted to drug tests in Mexico, which were negative for any illegal substances. Father worked with the DIF to complete his home study. While father had been complying with his court ordered services, the Agency had requested an additional six months of reunification services in order to coordinate with the DIF and Mexican consulate to assist in the reunification process with M., Johan, Joshua and Sh. On May 11, 2012, father received a certification of completion for parenting education.

Father said he last used methamphetamine in 2005, and completed a six month drug treatment program in Merced, as ordered by probation. Father denied any domestic violence between himself and mother, but stated that whenever mother stops taking her medication, she is "very difficult" to live with as she tends to be violent. The last time he spoke with mother was in March or April 2012; they talked about R. and mother's new partner. Mother told him everything was good and the partner was good to R., so he was not worried.

Father spoke every day with his daughter S., who lived with R.'s maternal grandmother, Barbara. On May 21, 2012, S. told him she was worried about mother not taking her medication because R. looked neglected. Father said he became worried and asked S. to call the social worker who had been assigned to mother's voluntary family maintenance case to ask him about drug testing mother. Father, however, did not know if that took place. Father denied that he told another social worker that mother had given R. medication in the past to help her sleep; he claimed the information was incorrect. He explained that because he took care of R. "the majority of the time" from February 14, 2011 until his arrest, he had contact with mother every day; during that time, mother was doing well "just like R." Father also stated that, because he was taking care of R. every

6.

day, he was only ordered to pay $28 in child support. When the social worker asked what he wanted to see happen with the case, father responded that he wanted mother to get better and R. to come live with him, his wife and her siblings in Mexico.

In a jurisdiction report, the social worker asserted that, based on her investigation, jurisdiction existed under section 300, subdivisions (a) and (b), but not under subdivision (g). The social worker contended subdivision (a) applied because R. remained at a substantial risk of serious future injury due to mother's inability to maintain consistent mental health treatment and sobriety, and subdivision (b) applied because R. remained at substantial risk of suffering serious physical harm or illness as a result of mother's inability to provide regular care due to her substance abuse and unstable mental health caused by her inconsistent use of her psychotropic medications. The social worker contended subdivision (g) did not apply because, while the petition alleged father failed to make any provision for R.'s care and support, (1) he had maintained contact with mother regarding R.'s welfare before his deportation, (2) due to his residence in Mexico, he had limited ability to provide and care for R., and (3) he was participating in, and complying with, reunification services for R.'s half-siblings that were in his care when he was arrested.

At an August 9, 2012 hearing, the Agency requested an order permitting it to apply for a United States passport for R., noting she has dual citizenship because father is a Mexican citizen. Mother consented to the request. On August 13, 2012, the juvenile court issued an order authorizing the Agency to apply for a United States passport for R.

In a disposition report, the Agency recommended R. be placed with father as the noncustodial parent and the petition be dismissed without prejudice. The Agency reported that father lived in Nayarit Jalisco, Mexico, with Andrea, his 75-year-old father, and his son, Alexis. Father was self-employed locally selling tacos on the weekends and denied any child welfare history growing up. Father had completed his reunification

7.

services for his four other children and was expected to reunify with them as soon as the process between the Agency, the Mexican Consulate and DIF was completed.

The social worker on mother's voluntary family maintenance case reported that mother was complying with her case plan, which required her to maintain a safe and stable environment for R. During the voluntary case, the social worker had contact with mother monthly at Barbara's home. It was not discovered until after R. was detained that mother had not lived there for quite some time and she apparently only visited the home to make contact with the assigned social worker. Mother never reported a new address to the Department.

R. was a healthy child who appeared to be meeting all of her developmental milestones. The social worker reported she was adjusting well to her foster family, and there were no problems or concerns that would indicate she needed mental health services.

The social worker opined that it was safe to place R. in father's care. The social worker explained that at the time of detention, he was the noncustodial parent, and he was not able to maintain a close relationship or communication with R. due to the distance between them, although he did maintain communication with his oldest daughter, S., who tried to provide him with updates about R.'s wellbeing. The social worker noted that father and Andrea had entered a family reunification case plan after his deportation, had completed all requested services, and were expected to reunify with their children. The Agency had no concerns at the time for R.'s safety if she were placed with father.

In addressing placement with father as the noncustodial parent, the social worker stated there were no identified concerns for father and it appeared appropriate to place R. with father. He was employed, in a relationship with his wife of 25 years, had custody of one of his children, and maintained a residence in Nayarit Jalisco, Mexico. He also had the support of his father, who lives with him, his wife, son and his sister. The social

8.

worker further noted that father had successfully completed the reunification case plan for his other children; he completed a parenting education program facilitated by DIF, random urine drug screens, a medical clearance, a home study, and a psychological assessment, also conducted by DIF. Attached to the report was DIF documentation in Spanish regarding father, including the psychological assessment, home study, pictures of father's home in Mexico, urine drug screens dated April 30 and July 17, 2012, a certificate of completion for parenting education, and a medical clearance.

The social worker explained the services father had completed as follows: "On May 11, 2012, [father] completed a parenting class called Padres 'Buen Trato.' The class was sponsored and held by the Desarrollo Integral de la Familia (DIF) de Bahia de Banderas, Nayarit, which is the local social services agency in their area. The Mexican Consulate in Mexico provided the Certificate of Completion. According to the progress reports that were provided, the parenting classes had six chapters that the parents completed. The topics ranged from developmental stages of the children, substance abuse and disciplinary methods. On April 30, 2012, [father] submitted to a drug test at the Laboratorio de Analisis Clinicos, San Simon. [Father] was ordered to drug test at this location by the [DIF]. [Father] came back negative for Amphetamines, Methamphetamines, Opiates, Marijuana (THC) and Cocaine. On July 17, 2012, [father] submitted to a drug test. [Father] came back negative for Amphetamines, Methamphetamines, Opiates, Marijuana (THC) and Cocaine. [Father] also completed a psychological assessment as part of the home study conducted by the DIF. The social worker assigned to the case did not note any concerns in regards to [father]'s mental and emotional well being. [¶] [Father] is able and willing to take custody of his daughter. He is currently employed and maintains a home in Mexico. [Father]'s living arrangements have been verified and confirmed by Social Services (DIF) in Mexico." The Agency recommended that R. be "dismiss[ed]" to father under section 361.2, subdivision (b)(1).

9.

The combined jurisdiction and disposition hearing was continued several times, and ultimately was held on October 15, 2012. It was confirmed twice, once at a September 13 hearing and again at the outset of the October 15 hearing, that mother was contesting both jurisdiction and disposition. At the October 15 hearing, mother testified about what happened the night R. ingested the pill, explained why she tested positive for methamphetamine after her arrest, and said what she was doing to address her issues.

Mother's attorney questioned father, who appeared by telephone with the assistance of an interpreter. Father testified that the drug charges on which he was arrested in October 2011 were for "maintaining a house or place for the use of marijuana." He confirmed he was accused of cultivation of marijuana, but claimed the charge was withdrawn because the marijuana belonged to his daughter's husband, who had a medical marijuana card. His daughter and her husband were living at his home at the time. The marijuana plants were in the "back part of the house" and were isolated from the rest of the family. Father was deported because he was undocumented. He signed a voluntary departure and "ICE" picked him up on December 28, 2011 and transported him to Tijuana, where he was left on December 29.

Father testified the pictures included with the DIF home study were of a two story house in which they had been living; the house had three bedrooms and two bathrooms. Father, however, said the family is now renting a four bedroom house because they needed a bigger house since R. might be coming to Mexico. The new house was four blocks away from the old one in the same subdivision. He lives there with his father, his wife, and his son. He was hoping to have his other children come live with them in the next month. Father and his wife were the only people in the household working to support the family. In addition to selling tacos on weekends, they get a check each month for 17,000 pesos. Father sent the social worker paperwork indicating he might open up a daycare in Mexico. Father said he took a course to open a child care and he would

probably open a daycare center in January 2013. His wife works as an instructional assistant in a kindergarten class.

The juvenile court invited argument on jurisdiction. Mother's attorney argued jurisdiction should not be taken because R. was not in danger and also argued that R. is "an American citizen and sending her to Mexico may very well deny her the opportunities and benefits of that American citizenship." County counsel and R.'s attorney both argued that jurisdiction should be taken over R. Father's attorney, who also asserted there was jurisdiction, added that the evidence shows father's a non-offending parent, that father had done remarkably well, and his testimony showed a clear plan to be able to care for R.

The juvenile court stated it was taking jurisdiction of R. under section 300, subdivisions (a) and (b). Addressing disposition, the juvenile court stated it was the Agency's recommendation to dismiss the matter with an award of custody to father, "who is claimed to have made a contact with an equivalent agency in Mexico who has checked out the situation and they rendered a report that recommends that the situation with the father and family in Mexico is appropriate, the housing is appropriate, so on and so forth." The court asked if anyone wanted to put on evidence as to disposition, or simply argue the facts in the report.

Mother's attorney believed he had "elicited information from my client and [father] on the dispositional issue and I've made my argument." He also asserted that mother had undertaken voluntarily the same kinds of services father had completed, that R. had spent her whole life with mother, and mother wanted an opportunity to have a case plan and show she can provide a safe living situation for R. to be returned to her. R.'s attorney asserted the court did not have an option except to follow the Agency's recommendation because father was non-offending and while he had reunification in another case, it looked like he had completed reunification and had a stable environment. R.'s attorney thought the court should follow the Agency's recommendation, noting that

11.

if the court did not send R. to Mexico, mother had already lost two other children and "would be bypassed in this situation." Father's attorney supported the recommendation. The Agency did not have anything to add.

The juvenile court did not think there was much question that father was the non-offending parent, and while it was "a little disturbing" that he was deported because of marijuana related charges, that did not take him out of the non-offending parent category. Accordingly, the court accepted and adopted the Agency's recommendation. The court further explained that it would terminate jurisdiction and award custody to father "who the court determines based on the evidence to be a non-offending parent and apparently has gone through appropriate checks with his home environment so on and so forth, living situation in Mexico, with the appropriate agency of the Mexican government, and they cleared him for this task, so that will be the order of the court."

The juvenile court consequently adjudged R. a dependent of the court, removed her from mother's custody, found that father is the presumed father, and ordered R. placed with father, the non-offending parent, without reunification services to mother. The juvenile court ordered that (1) the Agency be vested with the temporary care and placement of R. until receipt of her passport and she is delivered to the DIF in Mexico, (2) pursuant to section 361.2, subdivision (b)(1), father is R.'s legal and physical custodian, and (3) jurisdiction be terminated after the Agency receives R.'s passport and the Agency reports back to the court. The juvenile court also issued a custody order, which stated that Mexico is R.'s country of habitual residence, gave father legal and physical custody of R., and granted mother visitation rights as arranged by the parents.

## DISCUSSION

When a juvenile court orders removal of a dependent child from a custodial parent's care, it first must determine whether there is a parent who wants to assume custody who was not residing with the child at the time the events that brought the child within the provisions of section 300 occurred. (§ 361.2, subd. (a).) When a noncustodial

12.

parent requests custody, the juvenile court "*shall* place the child with the parent *unless* it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."  (§ 361.2, subd. (a), italics added.)  "The noncustodial 'parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence [of such detriment to] the child.""" (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1243 (*Karla C.*).)  If no detriment exists, the court orders placement of the child with the noncustodial parent.  (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1132.)

If the juvenile court places the child with the noncustodial parent, it may order either that: (1) the parent become the child's legal and physical custodian and terminate jurisdiction; (2) the parent assume custody subject to the jurisdiction of the court and require that a home visit be conducted within three months; or (3) the parent assume custody subject to the supervision of the juvenile court with services provided to either one or both of the parents, subject to further review hearings.  (§ 361.2, subd. (b)(1-3).)

As one Court of Appeal explained the juvenile court's options: "'[W]hen a nonoffending noncustodial parent requests custody under section 361.2, subdivision (a), he or she is requesting sole legal and physical custody of a child.  However, the court may not immediately grant that parent sole legal and physical custody.  The court must first determine whether it would be detrimental to the child to temporarily place the child in that parent's physical custody.  If there is no showing of detriment, the court must order the Agency to temporarily place the child with the nonoffending noncustodial parent.  The court then decides whether there is a need for ongoing supervision.  If there is no such need, the court terminates jurisdiction and grants that parent sole legal and physical custody.  If there is a need for ongoing supervision, the court is to continue its jurisdiction.'"  (*Karla C.*, *supra*, 186 Cal.App.4th at pp. 1244-1245.)

Here, mother challenges both the placement order and the termination of jurisdiction.  We begin, however, by rejecting the Department's assertion that mother has

13.

forfeited the right to challenge the placement order by failing to raise the issue of detriment at the hearing. Although mother's counsel did not use the word "detriment" in making his closing arguments, he did argue that R., an American citizen, should not be sent to Mexico because it could deny her the opportunities and benefits of American citizenship, and when the juvenile court asked the parties to address disposition, asserted he had elicited information on that issue through testimony and made his argument. In our view, mother argued detriment and preserved the issue for our review.[2]

Turning to the placement order, at the jurisdiction/disposition hearing, mother opposed placement with father. "[I]t is the party opposing placement who has the burden to show by clear and convincing evidence that the child will be harmed if the noncustodial parent is given custody. Clear and convincing evidence is evidence that establishes a high probability and leaves no substantial doubt." (*Karla C., supra,* 186 Cal.App.4th at p. 1243.) Thus, mother bore the burden below to establish that placing R. with father would be detrimental.

Ordinarily, the juvenile court's dispositional order is reviewed for substantial evidence. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) However, when the party who had the burden of proof at trial makes a substantial evidence challenge, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*).) "Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's

---

[2] Since we conclude the issue was not forfeited, and also address the issue of the juvenile court's termination of jurisdiction, we need not address mother's alternative argument that her trial counsel was ineffective for not raising these issues. Mother herself admits that should we address both issues, her ineffective assistance of counsel claim is "moot."

14.

evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Id.* at p. 1528.)

In evaluating detriment, the juvenile court is required to weigh all relevant factors to determine if the child will suffer harm. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425.) Emotional harm can support a detriment finding even in the absence of the noncustodial parent's contribution to detriment. (*Ibid.*) Because "detriment" has no clear-cut meaning, courts making placement decisions must have the ability to be flexible based on facts unique to each child and parent. (See *Guardianship of Zachary H.* (1999) 73 Cal.App.4th 51, 66.)

Here, the evidence before the juvenile court did not compel a finding that placing R. with father would be detrimental, i.e. harmful, to her. Instead, the evidence showed father was willing and able to provide R. with a stable, appropriate home, and was committed to caring for her. DIF evaluated father's home for placement positively. He was employed selling tacos on the weekends; the family also received a monthly check for 17,000 pesos and his wife, Andrea, worked as an instructional assistant. They recently rented a four bedroom home in a subdivision to accommodate their large family. Father had the support of his father and Andrea, and was caring for his son, Alexis. Father had completed reunification services for his four other children who were subjects of the 2011 dependency case and who would be soon be placed with him. His services included a parenting education program and random urine drug screens, which were negative. Father also received a medical clearance and psychological assessment; no concerns were noted regarding father's mental and emotional wellbeing.

Further, R. was not a stranger to the family, as father and Andrea had cared for her every day from February to October 2011. While two-year-old R. may not remember father, since she had not seen him for nearly a year, no evidence was presented that she would suffer lasting harm if she were removed from her current placement, where she

15.

had been for only three months, or that she was so closely bonded to mother that she would be harmed if placed with father. After his deportation, father did his best to keep apprised of R.'s status through his daughter S. His failure to visit R. was not out of indifference, but because he could not enter the United States since he had been deported. In the social worker's opinion, it was safe to place R. in father's care. The court was entitled to find the social worker credible and give great weight to her opinion. We cannot reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

Thus, there is evidence in the record that living with father would not be "detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) In the absence of detriment, father was entitled to have R. placed with him. Mother points to other evidence that would support a detriment finding, such as father's dependency history, that he has had children with women other than his wife, his criminal record, his low income, his prior use of drugs, his lack of a current relationship with R., and his failure to pay child support after his deportation. All of this evidence, however, was before the juvenile court when it declined to find detriment. As the Court of Appeal explained in *I.W.*, *supra*, 180 Cal.App.4th at page 1528: "It is not our function to retry the case. We therefore decline mother's implicit invitation to review the record so as to recount evidence that supports her position (reargument) with the object of reevaluating the conflicting, competing evidence and revisit the juvenile court's failure-of-proof conclusion."

Mother also asserts the juvenile court should have considered that R. was being moved "to a different country some 1,500 miles away, where a different language is spoken and the living conditions and culture are quite different," and that a move to

16.

Mexico, with its logistical and cultural issues, could result in substantial detriment.[3] However, "California's juvenile dependency law does not prohibit placement of children outside of the United States." (*Karla C.*, *supra*, 186 Cal.App.4th 1236, 1261, citing *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1412.) Instead, the party opposing placement in another country must present evidence that the child would suffer harm if placed there. No evidence was presented here that the culture of Mexico or the conditions of the city where father lives would be harmful to R.'s safety, protection, or physical or emotional wellbeing.

In sum, on the entire record, we cannot say that no judge reasonably could have made the decision made here, i.e. to place R. with father.

Mother also asserts the juvenile court abused its discretion when it terminated dependency jurisdiction. In her view, the court should have continued dependency jurisdiction because without it (1) she will have a difficult time enforcing visitation rights, (2) the juvenile court lost its power to order R.'s return to the United States should the placement fail, and (3) the juvenile court will be unable to entertain any subsequent request by mother for custody or reunification services.

When the juvenile court places a child with a noncustodial parent under section 361.2, it may order that the parent become the child's legal and physical custodian, provide reasonable visitation by the noncustodial parent, and terminate its jurisdiction over the child. (§ 361.2, subd. (b)(1).) The juvenile court has broad discretion when deciding whether to continue court supervision under section 361.2, subdivision (b). (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652; see *In re Nada R.* (2001) 89 Cal.App.4th

_____

[3] On January 2, 2013, mother filed a request that we take judicial notice of the facts that (1) the city where father lives in Mexico is approximately 1,500 miles from Merced, California, and (2) one Mexican peso is equal to approximately $.08, which means 17,000 pesos equals approximately $1,360. We deferred ruling on the request, which we now grant. (Evid. Code, §§ 452, subd. (h) & 453.)

1166, 1179 [section 361.2 vests the court with broad discretion in crafting a disposition pursuant to a child's best interest and a reviewing court will not disturb a juvenile court's custody determination unless it exceeds the limits of legal discretion].)  "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.'"  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

When deciding whether to terminate jurisdiction, "the court must determine whether there is a need for continued supervision."  (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451.)  The focus is on father's ability to care for R. without Department and court supervision, not on mother's ability to retain a forum by which she can seek future modifications of the custody or visitation orders.

Here, the juvenile court reasonably could conclude that father did not require continuing court supervision.  He already had completed family reunification services for his four other children, was being monitored by the DIF, and would soon be receiving custody of those children.  The social worker opined that R. would be safe in father's care and custody.  Based on these facts, the juvenile court reasonably could conclude, as it did, that continued supervision was not required and it was unnecessary to retain jurisdiction to ensure it could seek R.'s return should the placement fail.

Mother's contention that the juvenile court should have retained jurisdiction so she could have a forum to litigate visitation and custody issues is without merit.  Neither the juvenile court nor the Department should be required to mediate disputes between parents whose children no longer need the protection or supervision of the juvenile court.  There are other forums by which mother can seek to modify the custody or visitation orders. She cites no authority that requires the juvenile court to retain jurisdiction for those purposes, even where, as here, the child is placed in a foreign country.

In the case she does rely on, *Karla C.*, the juvenile court ordered the child placed with her noncustodial father in Peru and retained jurisdiction so the social services agency could provide an update on the placement and the child's status.  (*Karla C.*,

*supra*, 186 Cal.App.4th at pp. 1259-1260.)  In deciding whether the juvenile court abused its discretion in continuing its jurisdiction without assuring that it could still maintain effective jurisdiction over the child in Peru, the Court of Appeal reviewed family law custody cases involving international relocation which required trial courts to take steps to insure their custody and visitation orders would remain enforceable throughout the child's minority, and considered whether the juvenile court could assert its jurisdiction in Peru under the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.) or the Hague Convention.  (*Karla C.*, *supra*, 186 Cal.App.4th at pp. 1261-1270.)  The Court of Appeal held that, since the juvenile court retained jurisdiction, it was required to consider whether it could enforce its jurisdiction in Peru and impose any necessary or appropriate measures to ensure enforceability of the juvenile court's continuing jurisdiction and its orders while the child was outside the United States. (*Ibid.*)

Nothing in *Karla C.* requires the juvenile court to retain jurisdiction so the noncustodial parent can seek future modifications of custody or visitation.  If mother wanted a different visitation order, she could have requested one.  On this record, we find no abuse of discretion in the juvenile court's termination of dependency jurisdiction.

## DISPOSITION

The juvenile court's dispositional orders are affirmed.  Appellant's January 2, 2013 request for judicial notice is granted.